## LEONARD v. BROOKLYN HEIGHTS R. CO.

(Supreme Court, Appellate Division, Second Department. January 11, 1901.)

1. CARRIERS—STREET RAILROADS—INJURY TO CARS FROM ELECTRICITY.

Seven witnesses testified that a fire on a moving street car first showed underneath the car, that the fire enveloped the whole car, and that it seemed to be all on fire. An employé of the company, who saw 20 crippled cars every day, and whose attention was first called to this car when he was on the stand eight months afterwards, stated that after the accident he saw and operated the car, and that it was not injured or repaired, save in the replacement of a trolley finger. Another employé testified that he ran the car up and down the car house, but did not examine it. Otherwise, there was no evidence that the car was ever used again. *Held*, in an action by a passenger who was injured by jumping from the car, that it could not be said, from the evidence and from the physical facts, that the flames came only from the controller box in the front of the car, as the result of the burning of a trolley finger, and did not envelope the entire car.

2. SAME—QUESTION FOR JURY.

Electrical experts testified that if flames first appeared underneath an electric car in the rear, and then on the side and the front, the fire might be due to defective insulation of the underneath cables, and that any depreciation in the quality of the insulation due to moisture or wearing away of the rubber insulation could be found by a weekly application of the magnometer or voltameter test, made by one man in 15 minutes. Employés of the company admitted that this test was known by the railroad men, but they only made the test once a year, or when looking for trouble. The morning of an accident the company's inspector examined the cable on the car, running his hand over it, and looking where the cable was liable to wear or burn off, and found everything all right. *Held*, that the question whether the accident was caused by defective insulation, and whether the company used due care in its inspection, was for the jury.

3. SAME—EVIDENCE—ATTEMPT TO PREJUDICE JURY.

An employé of a street-car company, referring to injured cars brought into the shops, testified that he only inspected those which came in as crippled. *Held*, that a question on cross-examination asking him how many crippled a day came into his depot was not erroneous, as being an attempt to prejudice the jury.

4. SAME—EVIDENCE—TESTING MEMORY OF WITNESS.

An employé of the street-car company testified to inspecting every car when it came in after an accident. It appeared that he inspected a considerable number every day, that eight months had elapsed, and that his attention had first been called to the car in question when he was on the stand. *Held* competent, as testing his memory as to this particular car, to ask him how many cars a day he inspected, though he had made a memorandum at the time. which he had not produced.

5. SAME—INSPECTION OF CARS—DEGREE OF CARE—INSTRUCTIONS.

A charge that an inspection of cars and appliances must be sufficient to insure the safety of passengers against accident is not capable of the construction that the word "insure" was meant in the limited sense that the company was an insurer; the court further explaining that the company must exercise such duty of inspection as in the judgment of those who understood the subject was sufficient to insure, etc.

6. SAME.

In an action for injuries received by a passenger in jumping from an electric car, under evidence that the entire car was enveloped in flames, caused by defective insulation of the cables underneath the car, a charge that the company was bound to use the very highest degree of care in seeing that the electrical appliances in use on the car did not get out

of order, and so endanger the safety of passengers, was not erroneous, as requiring too high a degree of care on the company's part.

7. SAME.

A charge that if the company used care in the selection of its controller, and the inspection was sufficient, it was not liable, if in the exercise of due care the defect in the controller could not be discovered, was properly refused, since it ignored plaintiff's theory of the case, sustained by evidence,—that the fire originated from defective insulation of the cables underneath the car.

8. SAME—MEASURE OF DAMAGES.

Plaintiff, aged 31, living with her husband, a policeman, and doing all the housework, suffered a sprained back, a very bad sprain of the right ankle and a laceration of its ligaments, and three fractures and a laceration of the right ankle. There was much attendant pain and suffering. The right foot was normal in contour, but plaintiff complained of a weakness therein, and it was liable to give way with her at any time. There was considerable deformity in the left foot, and it was impossible for plaintiff to get her heel on the ground, and the foot would not support the normal weight of the body. There was a deformity of inability to move the foot, due to permanent inflammation. Plaintiff required support to stand, and a crutch in walking, and suffered continuous pain, and her crippled condition was permanent. *Held*, in an action for such injuries, that a verdict of $12,750 was not excessive.

Appeal from trial term, Kings county.

Action by Lillie Leonard against the Brooklyn Heights Railroad Company. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Affirmed.

Argued before GOODRICH, P. J., and WOODWARD, HIRSCHBERG, and JENKS, JJ.

J. R. Oeland, for appellant.
Isaac M. Kapper, for respondent.

JENKS, J. The defendant appeals from a judgment entered on a verdict for plaintiff for $12,750 for damages for personal injuries resulting from the negligence of the defendant, and from an order denying a new trial on the minutes. The plaintiff's case is that on June 9, 1899, she was a passenger on an open trolley car of the defendant; that there was first heard an unusual bumping, rumbling noise at the bottom of the car, called "bucking"; that this was heard by the conductor and the motorman, who continued the trip; that there shortly followed an outbreak of fire underneath the car, and at the rear end, and that then came an explosion; that fire and flames enveloped the car; that a panic fell upon the passengers; and that the plaintiff, in terror, leaped from the moving car and was injured.

The appellant assigns error in the denial of the motion to dismiss, made when plaintiff rested, and repeated at the close of the case. It contends that "before the evidence was ended it was conclusively shown that the flames only came from the controller box in the front of the car, as the result of burning one of the metallic fingers of the conductor, due to a latent defect in the metal, or to causes against which the defendant could not provide." But in the record I read testimony of seven disinterested witnesses (bystanders), Ryder, Schenck, Hanlon, Collins, Lemain, Cortes, and Gibney, that the fire

showed first beneath the car. At least two of them testify that it first appeared at the rear end. The appellant then states that "the fact that the flames did not envelop the entire car was conclusively proven by witnesses for the plaintiff and defendant, and by physical facts in the case." But these same seven witnesses testify, in effect (and many of them use the very words), that the fire enveloped the whole car, and that it seemed to be "all on fire." And two of the defendant's witnesses, Phillips and Marsh, say substantially the same thing. I have noted enough, not all, of the testimony on this subject. So far as the "physical facts" are concerned, the appellant depends mainly upon the testimony of its employé Arnold that on the day after the accident he saw and operated the car with both motors; that, save the replacement of a trolley finger, it was not repaired; that it was not burned,—and upon the testimony of an employé that the car was put in service. I find no proof that the car was put in service, save a statement of Coburn, a shop man, which is vague and inferential. It is testified that, after the new finger was put in, the car was run up and down the depot. But Arnold saw 20 or more crippled cars every day, and his attention was first called to the car on the witness stand, eight months after the accident. He said he had a memorandum, but he did not produce it, nor did he testify from it. He was asked: "Q. It is because of that general custom that you say you operated car 412? A. Yes; I tried it. I tried to find out if the car was out of order. I have a book, and I know." He said that he "could produce the book if he had it." Recess followed. But I find no further reference to the book. Arnold testified that it was not his business to repair the wiring, but he would call upon one of his men to fix it,—one of the shop men, the controller men, or men that looked after the wires. "Q. by Defendant's Counsel: If there were any repairs made to the wiring, would you have known it? A. No, sir. Q. Were there any? A. No, sir." Ukert and Coburn did the repairing, and Arnold says that he asked them to repair it, and "it was repaired" when he got there in the morning. All that Coburn did was to put a finger on, and try that end of the car to see that it was all right. He put in a finger and operated the car, from "the end he put the finger on," "up and down the car house." "Q. Did you look for injuries to it? I looked no further on the car; no, sir." Ukert did nothing. It seems that these witnesses are still in the employ of the defendant or its successor. So far as any discharge of the duties of these witnesses to their employer is concerned, I think that their testimony, at best, was for the jury (O'Flaherty v. Railroad Co., 34 App. Div. 75, 54 N. Y. Supp. 96; Volkmar v. Railroad Co., 134 N. Y. 418, 31 N. E. 870); for, though the car was not "inspected" by them previous to the accident, their subsequent inspection was work which they were employed to do, and consequently there was reason for their statement of a proper discharge thereof, which made their credibility a question for the jury (Carbon Works v. Schad, 38 Hun, 72; Des Marets v. Leonard & Co., 12 Misc. Rep. 81, 33 N. Y. Supp. 92; Brown v. James, 9 App. Div. 139, 41 N. Y. Supp. 1107; McElwain v. Railroad Co., 21 N. Y. Wkly. Dig. 21).

After these propositions, the learned counsel for the appellant argues that inasmuch as it is "conclusively shown" that the defects were in the controller box, and as there was evidence that the particular controller box was inspected on the morning of the accident, and that there was no visible injury or sign of defect, therefore there can be no negligence brought home to the defendant. The vice in this argument is that it ignores the theory of the plaintiff, which was supported by evidence. This theory is that the accident was due to the fact that the insulation of the electrical wires of equipment had become defective, and that in consequence there was a "short circuit," which caused the fire in the first instance. The defendant's witness, Cole, testified:

"Short circuit is where two wires have worn against one another inside of the hose,—worn through so that the wires are naked and come in contact. That is the result of defective insulation."

The cables were affixed underneath the car, so that they were exposed to dampness and to moisture, and so that they came in contact with the wet of rain or snow. It was shown that, if wet or dampness penetrated the hose, it tended to wear away the insulating material, and also that the vibration and jar of the car caused attrition, which tended to wear away the insulating medium, and that both high temperature and moisture were also effective. causes of depreciation. There was no substantial dispute of these theories by the defendant's witnesses, and, of those witnesses, Cole and Livermore admitted that if the fire and flames first appeared underneath the car, on the rear thereof, and then on the sides and on the front, the fire might be due to some defect in the wiring of these underneath cables. The learned trial justice asked the defendant's witness Cole:

"If anything was on fire at the bottom of the car, it would indicate that there was some trouble, further on, beyond the motor box,—beyond the fuse, —would it? A. Yes, sir. * * *. If the insulation was off, you could get the car on fire underneath. If the fire started underneath, you could have the fire at the rear and front, if the insulation was defective."

Prof. Sheldon, of the Polytechnic Institute, and Mr. Baussert, the plaintiff's experts, positively testified, in answer to a hypothetical question that fairly stated the case, that defective insulation was the only specific cause of this disaster. Hence there was evidence for the jury to determine whether the accident was due to defective insulation of the cable underneath this car, and therefore fairly arose the question whether the defendant had exercised due care in the inspection thereof. Prof. Sheldon testified that any depreciation in the quality of insulation could be found by a weekly application of the magnometer test, made by one man in 15·minutes; that it was a practical test for insulation beginning to wear away, so that considerable time might intervene the discovery of defect and the actual danger. Mr. Baussert testified that the voltameter test would show defective insulation. Mr. Cole, shop foreman in charge of the electrical depot at the Fifty-Eighth street station, called by the defendant, testified:

"If we wanted to detect the defective insulation in the cable holding the wires together, we would test them—the identical wires—with a magnometer.

* * * We would not do it unless trouble arose in that point. The magnometer test is the standard test to ascertain defective insulation; that is. in a cable,—for the short circuit in a cable. * * * We never make any tests, except after the cars are wired there is need of inspection to make a test if we are looking for trouble."

' He also testified that he had seen the voltameter test in use; that it was a common test, known thoroughly to railroad men, and that' short circuit is discovered by the use of these two tests; and that this test with the magnometer was only made once, in the spring of· the year. He said further that the voltameter test would show the wearing away of the rubber insulation, due to the vibration of the cars or to the dampness of the weather, even though the wires were not fully exposed. The defendant called its journeyman, Johnson, who testified that he· tested the cable of the cars on the morning of the accident, and that it was in order. He says that he looked at it "for dampness," ran his hand over it, examined the leads in the cable, looked where the cable is liable to wear or burn off, and found everything all right. He could not see through the canvas holes, but he could feel any external dampness. He did not pretend to know the effect of dampness "getting in" the hose. "I felt it," he says, "just to see if it was damp. That was all. Q. Just out of curiosity to see if you had a wet hose? A. Yes; I do that. There is something the matter if this thing gets damp,—if soaked in water. Q. By feeling, you found the extension of the hose dry? A. Yes, sir; therefore everything was all right. I never did see any other test applied to insulation, besides putting your hand on the hose. I have seen testing machines." Here was testimony of standard tests, known to all railroad men, that would detect any defective insulation in time to avoid all danger, and that could be applied by one man in 15 minutes, that would reveal any occult depreciation in insulation, met by evidence that a journeyman had made an inspection by looking and placing his hand on the cable for dampness. Dampness might have lodged within, and attrition might also have worn the insulation away. On that very morning, though the cable may not have been outwardly worn away or externally damp, insulation might' have depreciated to the point that fire and flame were ready to burst out. Can it be said, as matter of law, that the inspection of Johnson, coupled with the standard tests applied "in the spring," freed the plaintiff from the province of the jury? In Palmer v. Canal Co., 120 N. Y. 170, 177, 24 N. E. 302, 304, the court' held that:

"The apparent necessity for frequency of examination is somewhat dependent upon the liability to impairment, and the consequences which may be apprehended as the result of 'defective condition. But whether the system and the manner of its execution are all that may be required of the carrier cannot be measured by any rule of law to be applied by the court. It must, in view of the circumstances appearing by the evidence, be one of fact for the jury to determine upon proper instruction relating to the degree of care imposed upon the company; and while it is true that the question of fact presented is somewhat speculative, in the sense that it is not measured by any definite rule, it must nevertheless become a matter of judgment, to be expressed by the jury, and founded upon the evidence."

Defendant's witness Arnold, who inspected all of the cars, was
asked on cross-examination:

"How many cripples a day, of these Nassau cars, came into your depot?
Mr. Oeland: I submit it is an improper question, unless this is shown to
be the same kind of car. (Objection overruled, and the defendant excepts.)"

It is now urged that the sole purpose of the question was to
prejudice the jury. The term "cripples" was taught to the plain-
tiff's counsel by the witness, who said, "I don't inspect only those
cars as come in as crippled." The learned counsel for the defend-
ant argues that the question was not germane to test the memory
of the witness, because he had made a written memorandum at
the time, and was "practically testifying therefrom." He did claim
that he had made a memorandum, but he never produced it. It
appears that a considerable number of crippled cars came into the
shops every day, that eight months had elapsed between the time of
the accident and the trial, and that the attention of the witness was
first called to this car when he went on the stand. It was entirely
competent on cross-examination to test the memory of the witness
as to that particular car, and, to that end, to ascertain how many
cars passed under his observation every day.

It is urged that Mr. Justice Marean erred in charging the jury
that the inspection of the cars and appliances must be sufficient
"to insure the safety of the passengers against accidents." The
record reads:

"Mr. Oeland: We except to the modification. We ask your honor to in-
struct the jury that the care required of the defendant in the inspection of
its machinery was only such as was reasonably necessary to insure the
safety of the passengers in transferring them— The Court: Yes; they
did not have to inspect the car every fifteen minutes. The duty of inspection,
of course, must be reasonable,—such as, in the judgment of those who un-
derstand the subject, was sufficient to insure the safety of passengers. Mr.
Oeland: Such as experience has shown, in the operation of these cars, is
sufficient to find out the defects, if any. The Court: Such as is sufficient
to insure, or, rather, such as experience has shown to be sufficient to insure,
against accidents of this kind."

The context shows that the learned justice used the word "in-
sure" not in the limited sense that the defendant was an insurer;
for he said that they must exercise such duty of inspection as, in
the judgment of those who understood the subject, was sufficient
to insure. Would the learned counsel claim that his request was
that the court should charge that the defendant was an insurer,
for the reason that he also used the word "insure" in the request
that the care required of the defendant in the inspection of its
machinery was only such as was reasonably necessary "to insure"
the safety, etc.? Plainly not; for he used the word in the sense
of "to secure" or "to attain," not in the secondary and specific mean-
ing that he would fasten upon his word when it was adopted by
the court. It is not proper to denude the word of its context, or
to ascribe to it the specific meaning, when the context showed
that the use of the word was in a different and well-accepted sense.
The headnote in Caldwell v. Steamboat Co., 47 N. Y. 282, states
the rule:

"An appellate court will not seize hold of isolated portions of a charge for the purpose of discovering error. If the charge, as a whole, conveys to a jury the correct rule of law upon a given question, the judgment will not be reversed. If the language used is capable of different constructions, that one will be adopted which will lead to an affirmance of the judgment, unless it fairly appears that the jury were, or at least might have been, misled."

It is contended that the court erred in charging the jury as to the degree of the care resting upon the defendant. The learned court had charged:

"A railroad company is not the insurer of the safety of passengers, but its servants are bound to do all that man can do in the way of vigilance to protect them. They are bound to provide the most safe appliances, and to use the highest degree of care to see that the appliances do not get out of order after they are put in use. Now, there are but very few things in the world that do not wear out in time; but the defendant's duty was, as I have told you, to use the very highest degree of care, prudence, and vigilance in seeing to it that the electrical appliances in use on the car did not get out of order, and so endanger the safety of passengers."

At the close the learned counsel for the defendant made this request:

"I ask the court to instruct the jury that the care required of the defendant is not extraordinary care, but only the care that is necessary in reference to the use of the appliances and the danger incident to their becoming out of order. The Court: That is true; in the use of motive power like electricity,—power of such appalling possibilities,—it should be a very high degree of care. Mr. Oeland: I except to the modification, and to the refusal of the court to charge as requested."

The learned counsel says the proof in the case was—

"That the result of the finger burning out in the controller was usually a flash of flame—of fire—from six inches to a foot high. We submit that the care required should be commensurate with the danger to be anticipated, and that, as to the controller, the care required would be only ordinary care, commensurate with the result to be expected from the appliance coming out of order."

But the theory of the plaintiff was not that a flash of flame leaped up from the controller, but that the car was first on fire as the result of the defective insulation of the cables at the bottom of the car, and that the burning of the controller was merely an incident to the flame and fire that enveloped the entire car. Even assuming the proposition sound, there was no limitation in the language of the request, and so the criticism wholly disregards a vast deal of testimony in the case that substantiates the theory of the plaintiff. The learned counsel himself writes, in another part of his points:

"The rule as to inspection we understand to be a high degree of care, to keep the appliances and running gear of the cars in order. Stierle v. Railroad Co., 156 N. Y. 74, 50 N. E. 419, and motion for rehearing, page 684, 156 N. Y., and page 834, 50 N. E.; Palmer v. Canal Co., 120 N. Y. 174, 24 N. E. 303."

I assume, then, that the objection of the learned counsel is to the word "very." In view of the charge considered in the opinion of Mr. Justice Willard Bartlett in Koehne v. Railroad Co., 32 App. Div. 419, 421, 52 N. Y. Supp. 1088, affirmed November 27, 1900, 58 N. E. 1089, I think that Mr. Justice Marean was warranted in the expres-

sion now criticised. The decision in that case is sufficient statement of my reasons.

The learned counsel for the appellant asked the court:

"I ask your honor to charge,—this is a modification of the charge already requested,—if they believe that the railroad company used care in the selection of the controller in this case, and inspected the same, and that the inspection was sufficient under ordinary circumstances, and commensurate with the dangers incident to its use, even if it did blow out, they should find for the defendant, if, in the exercise of that care, they believe the defect could not have been discovered."

The court declined, under exception, and very properly declined, inasmuch as here was a request that, in effect, entirely ignored the theory of the plaintiff, namely, that the fire was due to defective insulation, and started at the bottom in the rear of the car, and that it was not primarily due to the controller or to any defect therein. The learned counsel did not limit his request by the supposition, if facts showed that the cause of the fire was the controller alone, or defects therein, or that it was confined thereto.

I have reviewed all of the questions presented by this appeal, save that of the excessive damages. The plaintiff suffered a sprained back, a very bad sprain of the right ankle, and a laceration of its ligaments, three fractures of the left ankle, and a laceration. There was much attendant pain and suffering. The hospital physician in attendance, who treated her at the house, also, examined her a week before the trial, and found the right foot normal in contour, but that the plaintiff complained of weakness therein, and that it was liable "to give way with her at any time." He found considerable deformity in the left foot; that it was impossible for the plaintiff to get her heel on the ground; that it was raised about an inch therefrom, and would not support the normal weight. There was the deformity of inability to move the foot, due to permanent inflammation. He was corroborated by two physicians. Plaintiff requires support to stand, needs a crutch in walking, and suffers continuous pain, and her crippled condition will be permanent. She is 31 years old, lives with her husband, who is a policeman, and has two children. Before the accident, she did all the housework. She says that she now requires an assistant, and that her children help her. The defendant offered no medical testimony.

The judgment should be affirmed, with costs. All concur.