(64 App. Div. 477.)

### PAINE v. ELECTRIC ILLUMINATING & POWER CO. OF LONG ISLAND CITY.

(Supreme Court, Appellate Division, Second Department. October 11, 1901.)

1. ELECTRICITY—ELECTRIC LIGHT WIRES—HIGH-TENSION CURRENT—TELEGRAPH WIRES—PROXIMITY.

An electric light and power company, whose wires carry such a high voltage as to make them dangerous to life if touched, is negligent in not stringing such wires at a height required by ordinary care to prevent contact with telegraph wires crossed thereby.

2. SAME—INSPECTION—FREEDOM FROM NEGLIGENCE.

An electric light and power company having wires of such high voltage as to be dangerous to life, which cross the wires of a telegraph company, and would make the latter deadly to linemen if the wires came in contact, does not show freedom from negligence, as a matter of law, by proving that the wires were inspected once a week.

3. SAME—CONTACT OF WIRES—IMMEDIATE CAUSE.

Where the wires of defendant electric light and power company were improperly strung, so that from natural causes they might sag, and touch telegraph wires, rendering the latter dangerous by reason of the high voltage of the former, it was not relieved of liability for injuries caused by the contact of the wires by reason of the fact that the more immediate cause of such contact was a storm, which swayed the wires, and caused them to sag sooner than they otherwise would.

4. SAME—LINEMEN—PROPER PRECAUTIONS—RUBBER GLOVES.

Plaintiff's intestate, while working as a lineman with telegraph wires ordinarily harmless, was killed by touching a wire which had been rendered deadly by contact with an electric light wire. Held that, the wires being ordinarily harmless, so as to be safely handled without the use of rubber gloves, plaintiff's intestate was not guilty of contributory negligence as a matter of law in not wearing them.

5. SAME—ASSUMPTION OF RISK—OBVIOUS DANGER—EXAMINATION OF WIRES.

Plaintiff's intestate was ordered to inspect a telegraph wire, and discover the cause of a leakage of the current. While ascending a pole for this purpose, he was killed by touching a wire rendered deadly by contact with an electric light wire. He was not told that there was any other trouble than leakage of the current, and a heavy current is not ordinarily to be expected where there is merely a leakage. He made no test to discover the presence of a high-tension current before ascending the pole. Held, that plaintiff's intestate could not be deemed to have assumed the risk, notwithstanding his failure to make such test.

Appeal from trial term, Kings county.

Action by Flora I. Paine, as administratrix, against the Electric Illuminating & Power Company of Long Island City. From a judgment in favor of plaintiff, and from an order denying a motion for a new trial, defendant appeals. Affirmed.

Argued before GOODRICH, P. J., and JENKS, WOODWARD, HIRSCHBERG, and SEWELL, JJ.

William E. Stewart, for appellant.

James C. Cropsey, for respondent.

JENKS, J. The plaintiff has a verdict for $6,500 damages for the death of her husband through negligence. The defendant insists that it was not negligent, and that the accident was contributed to by the negligence of the intestate. The intestate was a lineman

of the fire department of New York City, who had been sent at noon time of July 13, 1899, to the neighborhood of Vernon Avenue Bridge, in the borough of Queens, to "clear" a line of telegraph wire from which there was a leakage of the electric current. For this purpose he climbed a telegraph pole, put his leg over the lower cross-arm of it, and then his hand came in contact with one of the wires strung on the pole. Thereupon he fell back, was caught on the pole, and was taken down dead from a shock of electricity. The pole in question supported only the wires of the department and of the Western Union Telegraph Company. There were two cross-arms. The lower carried the wires last named, and the upper both kinds of wires. The voltages thereof were but 70 and 60, respectively, and were harmless. These wires ran north and south on the West side of Vernon avenue to this pole, passed through separate boxes thereon, and then down a cable along that pole, under the waters of Newtown creek, into the borough of Brooklyn. The electric light wires of the defendant were strung from a pole on the east side of Vernon avenue, opposite Flushing street, westerly across Vernon avenue, and thence along Flushing street. Thus they crossed the department and the Western Union wires at right angles. The voltage of the defendant's wires was in excess of 2,000, and was death dealing. One of such wires had come in contact with one of the Western Union wires that was suspended on the pole climbed by the intestate, and thereby the latter wire was made deadly also.

I think that the case was properly submitted to the jury by the learned trial justice, Dickey, J., and that there is no reason which warrants a reversal of this judgment. The liability of the defendant did not depend upon a contract relation or other privity between it and the plaintiff's intestate. Ennis v. Gray, 87 Hun, 355, 34 N. Y. Supp. 379. It was the duty of the defendant to use due care, in the stringing of its electric wires of dangerous voltage across the streets of the city, to be regardful of the existence of other wires, of the possibility of contact therewith, of the generation of high tension therefrom, and mindful that such other wires from time to time might require the attention of linemen and other workmen in the matters of repair, readjustment, clearance, insulation, and restoration to their normal functions. If the defendant failed to string its wires over the wires of the department and of the telegraph company at a height which ordinary care required in order to avoid contact therewith caused by sagging or other natural and ordinary causes, then it may be found negligent in the premises. Ennis v. Gray, supra; Dwyer v. Electric Co., 20 App. Div. 124, 46 N. Y. Supp. 874; Wittleder v. Illuminating Co., 47 App. Div. 410, 62 N. Y. Supp. 297; Clarke v. Railroad Co., 9 App. Div. 51, 41 N. Y. Supp. 78. It does not clearly appear when this wire was strung. The defendant testifies that it may have been a year before, or perhaps not as long. The superintendent testified that when put up it was suspended one foot above the Western Union wire. There is evidence that five or six months before the accident the wire hung but eight inches above, and sagged continually thereafter. There is also evidence

that some weeks before the accident the distance was but six inches, and evidence, also, that it was from eight to ten inches. The foreman of the defendant said that he had seen the wire for four or five months before the accident, and that the distance was about ten inches. The defendant's superintendent testified that the original distance was one foot. The plaintiff's expert testimony is that the smallest usual space required to guard against the dangers of sagging is three feet, and that sagging was always anticipated. The defendant urges that it was inspected once a week. But mere proof of inspection is not enough. Grifhahn v. Kreizer, 62 App. Div. 413, 70 N. Y. Supp. 973. The inspector testified that, in his opinion, any distance was sufficient if the wires did not form contact, and that one foot was practically safe enough; though he further testifies that all wires sagged, and that such a wire would sag twenty-four inches in two years. If the jury found that the wire was suspended for a year, here was testimony that the natural sag would annihilate the original space. The defendant further urges that it was the rule that, when sagging was discovered, the wire was made taut; but the inspector, while stating that he knew the wire would naturally sag from its weight, from the rain, and for the reason that these particular poles were in made ground, testified that he could not remember whether this wire ever sagged, or that he tightened it. The defendant also urges that the wire sagged very suddenly, but reference to the record cited shows that the witness testified: "That wire, and all the rest of them, sagged. I don't know how much it sagged in two years. It must have sagged about twenty-four inches. I don't know that it was gradual. I didn't think it did. It came very suddenly." At best the credibility of this testimony of the defendant's officers and inspectors was for the consideration of the jury. Leonard v. Railroad Co., 57 App. Div. 125, 67 N. Y. Supp. 985.

It is further urged that the accident was due to the severe storm of the night before, which swayed the wires and poles so that the defendant's wires came in contact with the Western Union wire, wearing away the insulation by friction, and thereby discharging the foreign current into the Western Union wire. But that does not relieve the defendant if the wires were originally strung improperly, as it is clearly established that sagging is natural to all wires, and that this is due not only to weight, but to rain, to wet, and to other natural causes. Though the storm precipitated or hastened the contact, yet such contact might well have been due to the original stringing, which made it possible or probable sooner or later. Neither wires nor attachments were broken by the storm, which the wire chief of the Western Union Telegraph Company testified did not "occasion trouble" to all the wires,—"not seriously; no; a few scattering troubles here and there throughout Long Island."

The defendant contends that the intestate, being an experienced lineman, was aware of the risks of his highly dangerous employment, and was negligent in not wearing gloves of India rubber. It was not shown that such was the ordinary or usual practice under

the circumstances; indeed, the only evidence upon the subject is to the contrary. It is true that there is testimony from several witnesses that they would not touch a wire of such voltage with bare hands, but this, obviously, is far from testimony that in the work undertaken by the intestate gloves were ordinarily used. Even if this had been shown, the question of requisite care under the particular circumstances of this case would have been for the jury. Dwyer v. Electric Co., supra. The appellant cites Illuminating Co. v. Patterson's Adm'x, 84 Va. 747, 6 S. E. 4, and Junior v. Power Co. (Mo.) 29 S. W. 988. These were actions by servants against masters whose electric wires were of high voltage,—facts well known to the plaintiffs. In the case at bar the only wires attached to the pole were harmless, and gloves were not required in handling them.

It is entirely true, as contended, that the intestate, when he climbed the pole, "assumed the risks of all patent defects which were obvious, or could, with the exercise of ordinary care, have been discovered or ascertained"; but the testimony falls far short of admitting the application of the doctrine of obvious risk. The learned counsel for the defendant states that the deceased knew that there was trouble with the wire, that it came from a high-tension current, and that he was sent out to find where the trouble was, and to clear the line. But I fail to find that the record establishes that the intestate knew that the trouble was due to a high-tension current, which is the salient fact of this proposition. Erwin, his superior, told him to go out and clear the line, and to locate the "ground" of the wire which appeared on the galvanometer; and all Erwin knew was that their electricity was leaking. He wished to stop the leak. He says: "I told him his trouble. That it was a ground." It then became the duty of the intestate to "go up the pole, and to clear the trouble or whatever was the source of trouble." Although Erwin did testify that he knew the trouble was high tension, and that he communicated that fact to the intestate, he almost immediately testified that he did not communicate such fact to the intestate, but that he notified him of the "ground" only, and that he himself did not know of the high tension until after the death of the intestate; that no word of high tension was communicated to his office that day. The jury might well have found that the intestate had been directed only to locate the grounding of the wires. It does not appear that at the time of the accident the intestate knew, or should, in the exercise of due care, have known, that the high tension had been communicated to any of the Western Union wires on the pole in question. And, on the other hand, there was testimony that a heavy current of electricity is not to be looked for when there is merely a "ground," for grounding depletes, and does not increase, the current; and that, if one be looking for a simple leak or ground, it is not customary to make any test before going up on a pole, as such a condition does not involve danger, and a heavy current would not be anticipated. There was also testimony that a test could not be made without ascending the pole.

The contact between the wire of the defendant and the wire of the pole ascended was at some distance from the pole,—about a short block away, says one witness. Whether, in the course of his attempt to reach the fire department box at the top of the pole, the intestate accidently touched a wire ordinarily safe, but suddenly made fatal by this contact a block away, or whether he intentionally clutched the wire to aid his climb, is impossible to determine. Whether his contact was by accident or by design, I think that the question of contributory negligence in this case was still for the jury. The wires on the poles were ordinarily harmless. The intestate's business required him to ascend to the top of the pole. From the nature of the trouble communicated to him, he had no reason to suppose that any of these wires had suddenly become lethal. There were no indications which made such a condition obvious to a man in the exercise of ordinary care and prudence, and under the circumstances it did not appear that he omitted any usual or ordinary precaution before attempting to perform his task, which either involved contact with the wires or made the handling of them natural under the circumstances.

The judgment and order should be affirmed, with costs. All concur.