FRIEDA PAUL, as Administratrix of the Estate of CARL PAUL, Deceased, Appellant, *v.* STATEN ISLAND EDISON CORPORATION et al., Respondents-Appellants.

STATEN ISLAND EDISON CORPORATION, Third-Party Plaintiff-Appellant, *v.* UTILITY LINES CONSTRUCTION Co., INC., Third-Party Defendant-Respondent.

Second Department, July 18, 1956.

312

*Benjamin H. Siff* for appellant.

*William F. McNulty* for Staten Island Edison Corporation, respondent-appellant and third-party plaintiff-appellant.

*William J. Hegarty, Ralph W. Brown* and *Jordan R. Bassett* for New York Telephone Company, respondent-appellant.

*Joseph Fennelly, William S. O'Connor* and *Gregory A. Lee* for third-party defendant-respondent.

BELDOCK, J.   This is an action to recover damages for the alleged wrongful death of plaintiff's intestate and for his conscious pain and suffering.   The intestate, a lineman employed by Utility Lines Construction Co., Inc., was a member of a crew engaged in the removal of electric wires from an old defective wooden pole and the transfer of these wires to a new pole.   While thus engaged upon the old pole the intestate was electrocuted when, at a point 20 feet above the ground, the pole suddenly broke, causing him to be thrown against high tension electric wires.   The poles were owned jointly by the defendants Staten Island Edison Corporation and New York Telephone Company.

Each of these defendants interposed a cross complaint against the other, and Edison impleaded Utility as a third-party defendant.   At the end of the plaintiff's proof before the court and a jury, the complaint was dismissed on the ground that, as matter of law, plaintiff had failed to make out a prima facie case against either defendant Edison or defendant Telephone Company, and the cross complaints and third-party complaint were accordingly dismissed.

Plaintiff appeals insofar as her complaint was dismissed. Edison appeals insofar as its cross complaint against the Telephone Company and its third-party complaint against Utility were dismissed.   The Telephone Company appeals insofar as its cross complaint against Edison was dismissed.

In reaching his conclusion that plaintiff, as matter of law, failed to establish a prima facie case, the learned Trial Justice relied on *Storm* v. *New York Tel. Co.* (270 N. Y. 103).   It is our opinion, however, that plaintiff did make out a prima facie case; that here serious questions of fact are presented; that such questions must be resolved by the jury and may not be decided by the court as matters of law; that such questions of fact were not presented in the *Storm* case, and that, upon analysis, the *Storm* case will be found to be readily distinguishable.

In a death action such as this, in which, at the end of plaintiff's proof, the complaint has been dismissed as matter of law, the facts must be read, and their sufficiency to establish a prima facie case, must be judged in the light of these four well-

established principles: (1) that the plaintiff is "not held to as high a degree of proof * * * as where an injured plaintiff can himself describe the occurrence"; (2) that the "evidence adduced at the trial is to be considered in the aspect most favorable to plaintiff", who "is entitled to the benefit of every favorable inference which can reasonably be drawn from the evidence"; (3) that the burden is on the defendant to establish the decedent's contributory negligence, and (4) that "if any possible hypothesis based on the evidence forbids the imputation of fault to the deceased, as matter of law, the question is for the jury" (*Andersen* v. *Bee Line*, 1 N Y 2d 169, 172; *Flynn* v. *Long Is. R. R. Co.*, 289 N. Y. 283; *Chamberlain* v. *Lehigh Val. R. R. Co.*, 238 N. Y. 233, 235; Decedent Estate Law, § 119).

Applying these principles here, the proof discloses the facts and inferences, stated below, and, again invoking such principles, these facts and inferences lead to the conclusion that plaintiff has established a prima facie case.

The old pole was owned and maintained by Edison and the Telephone Company pursuant to a written agreement made between them in 1923. The pole carried the wires of both. In the summer of 1948 they both decided to replace the old pole and to transfer their wires and equipment to a new pole. Except for the actual transfer of Edison's high tension electric wires and their appurtenances, all the work involved in this change appears to have been done by the Telephone Company. On January 4, 1949 it removed from the old pole its terminal box and three supporting bolts. These had been affixed at a point about 20 feet above the ground. On February 24, 1949 it erected the new pole alongside the old pole. It then cut off the old pole at its base or butt and securely lashed the old pole to the new pole. The lashings were at the butts and at a point 20 feet above the ground. The latter point was the precise location of the terminal box and bolts prior to their removal, as well as the precise point at which the old pole subsequently broke.

The old pole was 45 feet in its overall height, with 6 feet — the butt — anchored into the ground, and 39 feet extending above the ground. The new pole, after its installation, was 7 feet shorter than the old pole. The lashing at the base consisted of slings of five-eighths inch or three-quarters inch manila hemp rope and also wire. The lashing at the 20-foot elevation consisted of the rope slings.

With the new and the old pole thus prepared and made ready, Edison entered into a contract with Utility on July 7, 1949 which required Utility, on receipt of written notice from Edison,

to remove Edison's wires and apparatus "under the supervision" of Edison's general manager "and to his satisfaction." That Utility is an expert in the transfer of high tension electric wires, is undisputed.

Pursuant to said written contract, on August 26, 1949 Edison delivered to Utility two written work orders containing detailed specifications for the transfer of the wires and other apparatus from the old to the new pole. Both work orders included the statement "pole defective." This general indefinite statement was the only warning which the pole owners gave to Utility and its linemen.

On September 1 and 2, 1949, pursuant to Edison's said work orders, Utiltiy's crew of men, consisting of the foreman Cronin, three linemen, Lee, Crockett and the intestate, and a helper undertook the work of transferring the wires. It will be noted that this work was commenced about eight months after the Telephone Company had removed its terminal box and bolts and some six months after it had installed the new pole, cut off the old pole at its butt, and securely lashed the poles together.

Despite the *fait accompli* which Utility's employees found (with respect to the cutting of the old pole at its butt and the lashing it to the new pole, thus apparently rendering the defective pole safe), nevertheless, out of an abundance of caution, they put another rope lashing at the 20-foot elevation and they observed the practices which they customarily follow before attempting to remove the wires from *any* defective pole. They made three routine tests: (1) they struck the pole at various places with a hammer; (2) they probed the base or butt with a bar, and (3) they probed at various places above the butt with a screwdriver; this test, however, being made mainly to determine whether the wood would hold the linemen's hooks or spurs.

Of course, if the old pole had been tapped or probed at the precise point of the boltholes (20 feet above ground) a rotted dangerous condition would have been revealed. But admittedly the men did not make any tap or probe at that very point for several reasons: (1) the established practice is to make only spot checks, which they did; (2) the rope lashings obscured the boltholes; (3) such lashings, at the base and at the 20-foot elevation, securely bound to the new pole the lower portion of the old pole — the portion where rot usually occurs and the only portion which usually renders the old pole defective and dangerous; (4) the effect of cutting off the old pole at the butt and securely lashing it to the new pole was to eliminate the usual defect and danger in a defective pole and to make the old pole as stable and as safe as though it had been securely

anchored in the ground, and (5) during all the years of their combined experiences and in the countless numbers of defective poles upon which they had worked, they never found any defective pole to become so completely rotted at a point so distant from the lower portion or butt. As one witness said, with the old pole lashed as it was, " it couldn't be pulled down with a truck ".

The tests made by Utility's employees indicated that the old pole, though defective, was strong enough to permit them to do their work in safety. Accordingly, the three linemen ascended the poles. Their first act was to install a guy line on the new pole and " two bull lines." The latter are temporary lines which are so placed in relation to the guy line as to exert a counter stabilizing force. Then they proceeded to detach the wires from the old pole and to attach them to the new pole. They first detached the six wires from the buck arm on the old pole — this buck arm carrying the wires which run at right angles into the intersecting street, and then attached such wires to the buck arm of the new pole. The removal of these wires removed all the pull or strain upon the old pole and created a slack in its guy line. As one witness said, the removal of such wires not only removed all the strain upon the old pole, but it also released all the tension and tautness in the old guy line and caused it to have " a loop on it like a skipping rope." Only then, when it no longer served any practical function, did they remove the guy line from the old pole. Its removal at that stage of the work was also made necessary by the fact that otherwise it would interfere with the removal of the remaining " straightaway " wires.

The sole purpose of the guy line is to counteract the pull which is exerted only by the wires on the buck arm, that is, the wires which run at right angles to the pole or to the straightaway wires. The guy line simply keeps the pole straight and " in position "; it prevents the pole from bending or tilting. Once the buck arm wires are removed, however, there is no need whatever for the guy line, regardless of the pole's height, since the remaining straightaway wires do not exert any strain upon the pole. The primary purpose of the guy line, therefore, is to keep the pole upright while all the wires are attached, and not to prevent it from breaking or falling due to any rot which might exist or which might develop. Consequently, the removal of the guy line before the removal of the buck arm wires would cause the pole to bend or tilt and the wires to sag; but it would not cause the pole to break. Under such circumstances if the pole does break the proximate cause of the break is the rotted

condition of the pole and not the removal of the guy line. A fortiori, if the removal of the guy line has occurred after the removal of the buck arm wires, the proximate cause of any break in the pole must be its rotted condition.

After removing the guy line, the linemen continued to work on the straightaway wires and attachments for some 30 or 40 minutes. The foreman then announced that lunch time had arrived, and the men began to descend. It was during this descent that the old pole suddenly broke, causing the intestate to fall against the remaining wires and to be killed by electrocution.

As stated, the break occurred 20 feet above the ground, at the precise point of the boltholes and rope lashings. At this point the wood was found to be completely rotted and decayed, whereas at a point a foot below, the wood was found to be sound. The boltholes were about five-eighths or three-quarters of an inch in diameter; they completely penetrated the pole from side to side and had remained unplugged and exposed since the removal of the bolts. A wood expert testified, without contradiction, that it was these unplugged boltholes which caused "the rottenness and the brittleness" and that this rotten condition was the proximate cause of the break in the pole.

On the basis of these facts, all of which must be taken as true for the purposes of this appeal, it seems clear that simple issues of fact were created for determination by the jury, and that the final decision as to the defendants' negligence and as to the intestate's contributory negligence, must depend upon the jury's resolution of these factual issues. Briefly, these issues are: (1) whether under the circumstances here, the owners of the pole were obligated to specifically warn Utility and its linemen of the latent potential danger which one of such owners, the Telephone Company, had created when, eight months previously, it removed the three bolts and left the boltholes completely open and exposed; (2) if the owners did have such an obligation, whether, under the circumstances here, the vague general statement in the work orders "pole defective," constituted such a warning and was sufficient to discharge that obligation, and (3) whether, under the circumstances here, Utility and its linemen, including the intestate, should have discovered the latent danger produced by the unfilled boltholes and should have taken the necessary means to avert the danger.

The facts in the *Storm* case (*Storm* v. *New York Tel. Co.*, 270 N. Y. 103, *supra*) differ essentially from the facts in the instant case. In the *Storm* case, the decedent, a lineman

employed by the Westchester Lighting Company, was killed while attempting to remove its attachments from an old defective pole owned by the defendant, New York Telephone Company. Pursuant to an agreement between the two companies, the Lighting Company used the Telephone Company's poles for its (the Lighting Company's) wires. The agreement apparently required the Lighting Company to remove all its attachments when such removal was required by the Telephone Company. The Telephone Company, having ascertained after inspection that its poles were defective in the butts — the portions of the poles which are anchored in the ground and which, consequently, are concealed — thereupon installed a new series of poles and transferred its own wires to the new poles. Thereupon it gave notice to the Lighting Company to remove its equipment from the old poles. Instead of using the new poles of the Telephone Company, the Lighting Company erected its own new poles across the street. It then ordered its own employees, including decedent, to transfer its attachments from the old poles to its new poles. Before the employees commenced their operations the Telephone Company's supervisor, Fitzpatrick, personally visited the place of work and there specifically warned decedent's superiors, Williams and Frost, the Lighting Company's foreman and superintendent, respectively, of the dangerous condition of the poles due to the concealed rot and deterioration in the butts, which the inspection had disclosed. Fitzpatrick told Williams and Frost: '' For God's sake be careful because we know and you know that those poles are not sound. They are old and deteriorated.'' To this warning, Williams responded with the assurance: '' O. K., Fitz. Don't worry about it. I will take care of it.'' (P. 107.) Frost then told Williams '' to be sure to pike or rope the poles.'' Fitzpatrick also gave the same warning to the Lighting Company's district superintendent, who was a superior of both Williams and Frost. (P. 106.)

Despite the specific warning of the dangers and despite the specific assurance that adequate precautions would be taken, the decedent lineman thereafter climbed the old pole without taking the customary precautions to rope, pike or guy the pole, and without taking any other precautions. While he was thus engaged in trying to remove the Lighting Company's equipment the pole broke at its butt and fatally injured him.

Since all these facts appeared without contradiction and were virtually admitted, the Court of Appeals (in the *Storm* case), by a vote of four to three, held: (1) that the deceased lineman had been given reasonable or adequate notice of the dangers involved; (2) that, despite such notice, he had failed

to take care commensurate with the disclosed dangers, and (3) consequently, that the dismissal of the complaint as matter of law was proper.

As the basis for its conclusions, however, the Court of Appeals defined the owner's duty to the lineman as follows (p. 108): "Under ordinary circumstances the defendant is required to use reasonable care to provide safe poles. * * * Obviously where the unsafe condition of a pole necessitates removal of wires in order to replace the pole the owner cannot be required to furnish a safe pole. * * * Under such circumstances the duty imposed is to use reasonable care to give warning to the linemen."

This statement (in the *Storm* case) of the owner's duty was obviously made in relation to a dangerous condition created by a concealed or latent defect in the butts of the poles, the portions buried in the ground. The decision in that case, therefore, was predicated on the existence of a concealed or latent defect. The principal question before the court was whether, in view of such latent defect, the Telephone Company's warning which it gave to the lineman's superiors, was sufficient to bring home to the decedent lineman adequate notice of that defect. And the principal question decided by the Court of Appeals was that such vicarious warning was adequate.

The *Storm* case, therefore, may quite properly be said to postulate three rules of conduct in the relations between the owner of an unsafe pole and the linemen: (1) the owner owes a duty to warn the linemen of any latent defect or danger; (2) the owner discharges this duty if he gives adequate warning of such latent defect or danger either to the linemen or to their superiors, and (3) the linemen, after such warning of a latent danger, are required to take commensurate care to guard against it.

Applying these rules here, two questions are immediately posed for determination, namely: (1) whether the rotted condition produced by the unplugged boltholes was a latent or a patent defect, and (2) if it was a latent defect, whether the laconic and cryptic statement "pole defective" contained in the work orders was reasonably adequate to give the linemen warning thereof.

A latent danger is one that is neither visible nor discoverable by *ordinary* inspection or test. Here the empty boltholes and their danger fall within that definition.

The photographs in evidence, while indicating the existence of what in retrospect we now know are boltholes, do not disclose that prior to the break these holes were recognizable as boltholes. Nor do the photographs show prior to the break the

depth of the holes; nor the fact that they penetrate the pole from one side to the other; nor the fact that they are completely exposed to the elements for their entire depth and thereby have rendered the pole vulnerable to rapid deterioration. On the other hand, the photographs and the proof do indicate that prior to the break the outward appearance of the boltholes would evoke no special attention, because they were surrounded by weather-beaten overlapping and irregular cracks, grooves, furrows and channels — some of which appear to be as large as the boltholes and to encompass them. In their setting they appeared to be nothing more than superficial holes or bruises caused either by the elements or by the spurs or spikes of the many linemen who had previously mounted the pole. In other words, to the linemen the holes portended nothing of the ominous danger which they concealed, and, hence, they required no particular scrutiny or test by the linemen.

The linemen here made the regular routine examinations and tests of the defective pole to determine its safety for their purposes. Such tests did not, and would not, reveal the existence of the boltholes and the danger created by them, for several reasons: (1) the holes were obscured by the rope lashings; (2) the spot checks or tests, which are ordinarily sufficient, never cover every inch of the defective pole; (3) the linemen had found by experience that where a pole is defective because of rot, the rot is always in the butt and never at a point 20 feet above the ground; (4) their usual tests are not intended or expected to disclose a defect so high above the ground, and (5) the fact that the old pole had been cut at the base and lashed to the new pole would serve to make secure any ordinarily defective pole — that is, one which is defective due to the ordinary defects caused primarily by the elements.

Hence, the fair inference is that the unplugged holes were neither visible nor discoverable by the customary inspection or tests, and that they constituted latent defects which gave rise to latent dangers.

The next question is whether the linemen received adequate warning of such latent defects and dangers. Sole reliance for such warning is placed upon Edison's work orders to Utility. On these orders, among the detailed specifications for the performance of the work, there is to be found the general statement " pole defective ". No clue whatever is given as to the nature, the location, or the extent of the defects, or as to whether the defects are the ordinary ones which are usually to be found in the butt and which are created by the elements, or as to whether they are, or may be, extraordinary latent defects or artificial

defects induced by man, or as to the special precautions which should be taken to avert the danger which might be caused by the defects.

This general, undefinable statement in the work orders obviously was ineffectual to alert these experienced linemen to any special or latent danger 20 feet above the ground, particularly since the proof shows that, as a result of performing innumerable similar jobs in which they shifted wires from an old to a new pole, they already knew that the old pole here must be defective. Their knowledge, however, no matter whence derived, was confined to the common defects — those which occur primarily in the butt of the pole within the ground and which are formed by the ravages of time and nature — and not those which are created or induced by the hand of man 20 feet above the ground.

Not only does the proof here support such a factual finding or inference as to the extent of the linemen's knowledge, but the courts have even taken judicial notice of such knowledge (cf. *La Duke* v. *Hudson Riv. Tel. Co.,* 124 App. Div. 106).

Consequently, this laconic and cryptic statement "pole defective" in the work orders served no particular purpose and gave no particular warning of the potential latent danger which lurked within the unplugged boltholes. Whatever significance or emphasis this vague statement might otherwise have had is lost by its close association with a maze of detailed specifications. In the setting in which it was contained, it constituted, at most, nothing more than a useless, perfunctory repetition of a common fact generally known by all experienced linemen. The gross inadequacy of this warning becomes even more glaring when it is compared with the explicit personal warning of the latent defect given in the *Storm* case.

In other words, the reasonable or adequate warning as to every latent danger, to which the linemen are entitled, clearly contemplates an effective warning — one which will enable them to locate or identify the risks involved and to take commensurate care in guarding against them. Unless the warning be coextensive with the potential defect or danger, it loses all its efficacy and becomes instead a trap which serves only to lull the linemen into a false sense of security. Consequently, when the notice is just "a general and indefinite warning that dangerous conditions may arise and nothing more", the owner has not performed his duty, particularly if his own "negligence causes the dangerous conditions." (*Larkin* v. *New York Tel. Co.,* 220 N. Y. 27, 32.) An owner should not gain immunity "where the dangers are obscure to the worker" but are known to the owner (*Caspersen* v. *La Sala Bros.,* 253 N. Y. 491, 495).

The decision in the case at bar and the decision in the *Storm* case are in accord with the rules heretofore enunciated in prior decisions.

The general rules are that toward business visitors such as workmen, the owner of any premises or structure owes the duty of exercising reasonable care either to provide a safe place in which to work or to warn them of any unusual danger; that, consequently, they are entitled to expect that the owner will use reasonable care to prevent injury " ' from unusual danger which he knows or ought to know ' ", and that an owner is liable to the workmen for bodily injury if the owner " ' knows, or by the exercise of reasonable care could discover ' the dangerous condition of his premises, and fails ' to make the condition reasonably safe, or to warn them of the condition and the risk involved therein.' " (*Haefeli* v. *Woodrich Eng. Co.*, 255 N. Y. 442, 448–450; cf. *Thomas* v. *Solvay Process Co.*, 216 N. Y. 265, 272; *Koehler* v. *Grace Line*, 285 App. Div. 154, 156.)

To these general rules, however, there are two well-recognized exceptions: An owner is relieved of responsibility either to furnish a safe place to work or to give warning of danger (a) where the structure is defective and the workman is employed for the specific purpose of correcting or repairing the defect, because " [n]o responsibility rests upon an owner * * * to one hurt through a dangerous condition which he had undertaken to fix " (*Kowalsky* v. *Conreco Co.*, 264 N. Y. 125, 128), and (b) " ' where the prosecution of the work itself makes the place and creates the danger ' ", that is, where the work is in the construction of the place, as in the case of a lineman who was injured because of a polesetter's negligence in setting a new pole in soft marshy ground, both of them being fellow servants engaged as part of the same gang in the operation of erecting a series of new poles and wires (*Mullin* v. *Genesee County Elec. Light, Power & Gas Co.*, 202 N. Y. 275, 279; *Citrone* v. *O'Rourke Eng. Constr. Co.*, 188 N. Y. 339, 342).

In the case at bar, the learned Trial Justice held, in effect, that the work in which the intestate was engaged created the danger and, hence, the stated exceptions to the general rules preclude recovery. In our opinion, the work done by him does not come within the purview of the exceptions. Neither he nor his coworkers were engaged in repairing any defect in the pole. Nor were they engaged in the erection of the dangerous structure. They were simply working upon an existing and completed, albeit unsafe and dangerous, structure. One who is engaged to remove or repair any appurtenance of such a structure may not be said to be engaged in the very work which

created the danger (cf. *Mullin* v. *Genesee County Elec. Light, Power & Gas Co., supra,* p. 280; *Kranz* v. *Long Is. Ry. Co.,* 123 N. Y. 1, 5).

It is our opinion that the intestate's work falls more properly within the scope of the general rules. Consequently, since defendants could not furnish him a safe place to work, it was incumbent upon them to warn him of the dangers involved. That, essentially, is the holding in *Storm* v. *New York Tel. Co.* (270 N. Y. 103, *supra*). As pointed out by Judge FINCH (p. 108): '' Under such circumstances the duty imposed is to use reasonable care to give warning to the linemen '', but, as previously noted, such duty to warn is confined to latent, concealed, or unexpected dangers which are not visible or discoverable on ordinary inspection. Wherever the danger is of that nature, it has been consistently held that the owner or employer is obliged to warn the workman of such danger and that in the absence of such warning the owner or employer is liable, since the workman is not contributorily negligent if he fails to discover or avert the hidden danger (cf. *Olive* v. *Whitney Marble Co.,* 103 N. Y. 292, 301; *Raab* v. *Hudson Riv. Tel. Co.,* 139 App. Div. 286; *Riker* v. *New York, Ontario & Western Ry. Co.,* 64 App. Div. 357; *Paine* v. *Electric Illuminating & Power Co.,* 64 App. Div. 477, 481, 483; *Walsh* v. *New York & Queens County Ry. Co.,* 80 App. Div. 316, affd. 178 N. Y. 588; *Bland* v. *Shreveport Belt Ry. Co.,* 48 La. Ann. 1057).

On the basis of the facts here adduced and on the basis of the most favorable inferences therefrom (to which plaintiff is entitled), it may not be said that, as a matter of law, either the intestate or the defendants discharged their obligations to exercise reasonable care. The duty of each must be '' gauged by the ability to anticipate '' (*McGlone* v. *William Angus, Inc.,* 248 N. Y. 197, 199); by the rule that '' [t]he risk reasonably to be perceived defines the duty to be obeyed '' (*Palsgraf* v. *Long Is. R. R. Co.,* 248 N. Y. 339, 344), and by the rule that the '' standard of care required of one maintaining a dangerous agency must be commensurate with the risk therefrom reasonably to be foreseen.'' (*Bennett* v. *New York & Queens Elec. Light & Power Co.,* 294 N. Y. 334, 337.)

Here, tested by these rules, it is clear that defendants, rather than the linemen, possessed the ability to anticipate and to reasonably perceive the risk of injury from the unplugged boltholes. One of them, the Telephone Company, actually made the holes; the other, Edison, as joint owner, after the lapse of eight months, is chargeable with constructive knowledge thereof, especially since, under its contract with Utility, the linemen's

work was to be done under the supervision of Edison's general manager. Under such circumstances it may well be said that defendants' duty was either to guard against the latent potential danger created by the unplugged holes or to give the linemen adequate warning of such danger; that defendants failed to properly discharge this duty, and that the intestate was not guilty of contributory negligence in failing to discover the danger and to avert it.

The foregoing discussion merely leads up to, and is intended only to emphasize, the one dominant factor which governs the disposition of this appeal. Whatever the ultimate finding or conclusion may be concerning the respective duties of the intestate and the defendants and concerning their breach of such duties, nevertheless conflicting and varying inferences from the proof adduced may well be drawn as to each of these issues. In such a situation, the cardinal rule is that it is peculiarly within the province of the jury, and not the court, to make the decisive inference which will determine the measure of the duty and the liability of each (*Bennett* v. *New York & Queens Elec. Light & Power Co.,* 294 N. Y. 334, 337–338, *supra; Larkin* v. *New York Tel. Co.,* 220 N. Y. 27, 32, *supra; Thomas* v. *Solvay Process Co.,* 216 N. Y. 265, 272–273, *supra*; *Abbott* v. *New York Public Lib.,* 263 App. Div. 314, 319; *Koehler* v. *Grace Line,* 285 App. Div. 154, *supra*; *Murphy* v. *Rochester Tel. Co.,* 208 App. Div. 392, 397, affd. 240 N. Y. 629; *Schubart* v. *Hotel Astor,* 168 Misc. 431, affd. 255 App. Div. 1012, affd. 281 N. Y. 597).

That conflicting inferences may be drawn from the proof here adduced by plaintiff is perhaps best demonstrated by the dissenting opinion (*infra*). Without qualification it declares: (1) that Utility and its linemen had knowledge " that the area of danger from a break due to dry rot existed upward from the lashing 20 feet above the ground "; (2) that at " the area where the pole snapped there were well-defined and unplugged bolt-holes ", and (3) that the guy wire which the linemen detached from the old pole " was the only support above the lashing for the pole."

These declarations are not supported by any direct proof in the record. They are, however, *fair* inferences which may be, and apparently have been, made by our learned colleagues. But these inferences, although fair, are not the *most favorable* inferences to which the plaintiff is entitled on this appeal. The *most favorable* inferences are those which have been indicated herein. Clearly, wide disparity exists between the *fair* inferences drawn by the minority and the *most favorable* inferences drawn by the majority. It is the very existence of these conflict-

ing and debatable inferences which creates the issues of fact for the jury's determination.

The same observations may be made concerning the inferences drawn by the learned Trial Justice.

It may be pointed out that here the defendants themselves undertook to guard the linemen against danger from the defective pole. For, as stated, some time before the intestate commenced the job, the old pole had been cut at the base and securely lashed to the new pole at the base and 20 feet above. This was an independent operation apparently performed by the Telephone Company which attempted thereby to eliminate the most common source of danger due to the most common defect: rot and decay in the butt which is buried in the ground. In effect, then, persons other than the intestate and his coworkers had attempted to prepare the old pole and to render it safe for the removal of its wires. Hence, it " was prepared not by him [decedent], but for him long before he began work ". Under such circumstances it may well be held that the independent preparation by either defendant, if negligently done, is enough to cast it in liability (cf. *Citrone* v. *O'Rourke Eng. Constr. Co.,* 188 N. Y. 339, 343, *supra; Kranz* v. *Long Is. Ry. Co.,* 123 N. Y. 1, 5, *supra*). Having voluntarily undertaken a duty, a defendant may be held responsible for its negligence in the performance of such assumed duty (cf. *Marks* v. *Nambil Realty Co.,* 245 N. Y. 256; *Frazer* v. *Bader,* 263 App. Div. 838). But again, under all the circumstances, whether defendants did undertake such duty and whether either or both were negligent in its performance are questions of fact to be resolved by the jury.

The admonition, perhaps unnecessary, should be added that by the foregoing statements it is not intended to hold, or even to intimate, that plaintiff, after a new plenary trial, shall be entitled to recover. Whether plaintiff should ultimately prevail will depend upon the proof adduced at the new trial and upon the inferences which the jury may see fit to draw therefrom (cf. *Runkel* v. *City of New York,* 282 App. Div. 173, 179).

The judgment, as amended, should be reversed and a new trial granted, with costs to appellant to abide the event, payable by respondents-appellants Staten Island Edison Corporation and New York Telephone Company.

WENZEL and MURPHY, JJ. (dissenting). Utility Lines Construction Co., Inc., specializes in the extremely dangerous work of transferring high tension electric lines from old to new poles without interruption of service. It undertook to perform its specialty as to a 20-year-old pole jointly owned by defendants. As customary, prior to the time that Utility took charge, defend-

ants installed the new pole, which was 32 feet above the ground and 7 feet shorter than the old one, severed the old pole at its base, and lashed both poles together at the base and 20 feet above the ground. The old pole was defective; that was the reason for its replacement. It was so stated in writing to Utility, whose foreman on the job was aware of its status. While plaintiff's intestate, an employee of Utility, was at work, the old pole snapped at a point 20 feet above the ground, causing his death. Under the circumstances no actionable negligence can be imputed to defendants (*Storm* v. *New York Tel. Co.*, 270 N. Y. 103; *Kowalsky* v. *Conreco Co.*, 264 N. Y. 125; *Mullin* v. *Genesee County Elec. Light, Power & Gas Co.*, 202 N. Y. 275). The proximate cause of the accident was the negligence of Utility, its foreman and employees, including the intestate. Despite knowledge that this was a defective pole and that the area of danger from a break due to dry rot existed upward from the lashing 20 feet above the ground, they did no more than perfunctorily to tap and make two isolated jabs with a knife to determine the texture of the wood. At the area where the pole snapped there were well-defined and unplugged boltholes surrounded by cracks, grooves, furrows and channels. No examination was made of this area although it was there that Utility had added a lashing of the poles. There was no higher lashing by Utility. Immediately prior to the accident, three workers, including the intestate, each weighing 170 pounds, were engaged, above the lashing, in shifting and swinging around on the old pole after they had detached a guy wire, which was the only support above the lashing for the pole.

NOLAN, P. J., and KLEINFELD, J., concur with BELDOCK, J.; WENZEL and MURPHY, JJ., dissent and vote to affirm, in memorandum.

Judgment, as amended, reversed and a new trial granted, with costs to appellant to abide the event, payable by respondents-appellants Staten Island Edison Corporation and New York Telephone Company.