(20 App. Div. 124.)

DWYER v. BUFFALO GENERAL ELECTRIC CO.

(Supreme Court, Appellate Division, Fourth Department. July 29, 1897.)

1. ELECTRIC LIGHT COMPANIES—NEGLIGENCE—EVIDENCE.
Plaintiff's intestate, a lineman employed by a telegraph company, while climbing a pole to repair a wire, reached out his left hand to grasp an iron brace, and, according to plaintiff's evidence, did grasp it, when he suddenly threw up both hands, fell over backward to the ground, and was killed. Defendant electric light company had placed one of its poles so near the telegraph pole that the electric wire came in contact with the iron brace, and by constant friction had lost its insulating cover, though such contact and the loss of the insulating material were not noticeable from the street. The electric wire was charged with enough electricity to cause instant death, while the telegraph employés were accustomed to handle the telegraph wires without gloves. A test made a few days after the accident tended to show that the brace was charged with electricity, and a witness who examined intestate's left hand after the fall testified that there was a mark of rust across it, while the evidence of the physicians who conducted the autopsy was conflicting as to whether intestate had received an electric shock. *Held* to warrant a finding that defendant's fall was caused by electricity communicated to the brace by the electric wire, through defendant's negligence, and that intestate was not himself negligent.

2. OPINION EVIDENCE—FACTS.
The statement of a witness who saw another person attach one end of a wire to an iron pole, so as to form a current for electricity to the ground, and touch the other end to an iron brace on an adjoining telegraph pole, that the flash which occurred was caused by the contact of the wire with the brace, was competent as a statement of fact.

Appeal from trial term, Erie county.

Action by Kate Dwyer, as administratrix of Michael Dwyer, deceased, against the Buffalo General Electric Company, to recover damages for intestate's death.  From an order denying a motion for new trial after judgment for plaintiff, defendant appeals.  Affirmed.

Argued before HARDIN, P. J., and ADAMS, GREEN, and WARD, JJ.

Tracy C. Becker, for appellant.

Ansley Wilcox, for respondent.

HARDIN, P. J.    On the 23d of August, 1895, Michael Dwyer, the husband of the plaintiff, in William street, in the city of Buffalo, lost his life, and the plaintiff brings this action to recover damages. A trial was had at the March trial term in Erie county, before the court and a jury, and a verdict of $6,000 was rendered in favor of the plaintiff.    It is alleged in the complaint that prior to that time the defendant had constructed one of its lines for the transmission of electricity along the northerly side of William street, in the city of Buffalo, and that at the northwesterly corner of William street and the tracks of the New York Central & Hudson River Railroad Company, where the same cross William street, defendant had erected a pole to carry its said electric light wires, "and had negligently and improperly placed the said pole near to a certain other pole containing a large number of telegraph and telephone wires of the Western Union Telegraph Company and the Bell Telephone Company of Buffalo, which said last-mentioned pole and wires were lawfully placed in their position, and the defendant had negligently and improperly strung its electric light wires upon its said line of poles, and had negligently failed to keep and maintain the same in proper condition, so that the said electric light wires were immediately under the said telegraph and telephone wires, and one of the said electric light wires came in contact with a certain iron brace on the pole supporting the said telegraph and telephone wires, and forming a part of the structure designed to hold up the said wires, and that by reason of the said electric light wire coming in contact with the said iron brace, and rubbing against the same, the protecting and insulating material was rubbed off from the said electric light wire, so that the said iron brace became heavily charged with electricity; all of which was due to the faulty and negligent construction and maintenance of the said pole and line of the defendant company."    The deceased was in the employ of the Western Union Telegraph Company as a lineman, and it became his duty to "lay out, construct, and repair lines of telegraph wires on the poles of the said Western Union Telegraph Company"; and it is averred that on that day he was directed by his employer to repair certain telegraph wire on the said William street line of said company.    It is further averred that "for the purpose of repairing said wire he was obliged to, and did, climb the pole of the Western Union Telegraph Company located at the northwesterly

corner of William street, * * * standing near the pole of the
defendant; * * * that while the said Michael Dwyer was climb-
ing the said pole lawfully, and in the performance of his duty, and
in the exercise of due care and caution, he grasped or came in con-
tact with the said iron brace upon said pole, which was in con-
tact with the electric light wire of the defendant, and was heavily
charged with electricity therefrom, without any knowledge or notice
or means of ascertaining that said brace was in such a condition,
or that the said brace was in any way dangerous; and by reason of
touching the said brace he received a shock of electricity which
caused him, without any fault or negligence on his part, to fall from
his position to the ground, and that he was then and there killed,
and died." The answer of the defendant admits its incorporation,
and "that the defendant is engaged in the transmission of electricity
for sale and for general lighting, and for other purposes in and
throughout the city of Buffalo, * * * which electricity is trans-
mitted through metallic wires suspended upon poles, which are gen-
erally placed upon and along the streets of said city; that the said
wires are covered with a protecting or insulating material"; and
that the defendant "had erected a pole to carry its said electric
light wires." The answer contained denials of certain allegations
in the complaint, and alleged "that the injuries to the plaintiff's in-
testate, as set forth in the complaint, were caused wholly through
the fault or negligence of plaintiff's intestate, or some person or
persons to this defendant unknown."

From the evidence it appears that the deceased was sent out on
the morning of August 23d to remedy some trouble that had been
reported on the line of a telegraph wire of the Western Union run-
ning along William street and crossing the railroad tracks. At
about 10 o'clock in the morning he climbed, by means of iron spurs
fastened on the inside of his ankles, the telegraph pole belonging
to the Western Union Company, while in the performance of his
duty. After reaching a point at the upper end of the pole, where
he could reach the last cross-arm on the telegraph pole, which was
some 28 feet from the ground, he reached up with his left hand,
apparently with a view to grasp the cross-arm or the iron brace
under it. He then suddenly threw up both hands, and fell over
backward in a circle, his feet clinging to the telegraph pole by the
spurs until he had about completed his revolution, when he fell
foremost to the stone pavement at the foot of the telegraph pole, and
near to it, dead. Several witnesses were produced by the plain-
tiff who described the circumstances attending the deceased's climb-
ing the pole, and the manner in which he fell. The witnesses are
in substantial accord in the narration of the observations made by
them of the deceased from the time he commenced to ascend the
pole until he descended. Upon the other hand, the defendant called
as a witness one Donovan, who describes the observations that he
made attending the deceased's movements up the pole and down
again, in many respects in conflict with the evidence produced by the
plaintiff. The evidence offered by the plaintiff tended to establish
the fact that when the deceased had climbed up the pole he put out

his hand, and reached the iron brace which supported the lowest cross-arm of the Western Union pole, and that instantly, upon his hand coming in contact with the brace, he received a sudden shock of electricity, which caused him to throw up his arms, and to let go of the pole, and to fall to the ground.  Upon all the evidence detailed in respect to the circumstances of his fall, it may be said there is room for some doubt whether he was instantly killed by the shock of electricity, or whether that caused him to let go his fastenings of the pole, and to fall to the ground, and that his death ensued from the injuries which he received,—the breaking of his back-bone, and the injuries to his skull; and it may be said a fair question of fact was presented to the jury to determine whether the proximate cause of his death was the shock of electricity which he received or the injuries which he sustained by reason of the fall. The evidence tends to show that supporting the Western Union wires was a V-shaped brace placed there to strengthen the cross-arm.    It consisted of two iron bars bolted together at the bottom by a single bolt and fastened into the telegraph pole some 18 inches below the cross-arm and extending from the pole out to the cross-arm at an angle of about 45 degrees.    The evidence indicates that the telegraph pole was erected and the cross-arms placed thereon and the wires of that company placed there in March, 1894, and that subsequently the defendant, under a grant of authority from the common council of the city of Buffalo, and in accordance with law, placed its line of poles, wires, and lights along William street, being lawfully in the street, under a grant from the common council. It appears that there were before the jury two braces and two bolts similar to those on the Western Union pole; and there was evidence tending to indicate that one of defendant's electric light wires was in contact with the iron brace, and that the wire, by constant friction, caused by rubbing against the iron brace, had lost its insulating cover to such an extent that the copper wire came in direct contact with the iron brace.    There was some evidence tending to indicate that the wire of the defendant touched two of the braces, and to the effect that the one where the abrasion of the insulation was the greatest was the westerly one.    The evidence tends to indicate that the electric light wire was charged with electricity, carrying at that time about 1,100 volts, which, according to the witnesses, is sufficient to give a deadly shock and cause instant death to any one receiving the full force thereof.    In addition to the circumstances disclosed by the witnesses who saw the accident, the plaintiff produced at the trial four photographs of the pole in question and its immediate surroundings, and gave evidence in connection therewith as to the manner in which they were taken, and as to the circumstances disclosed in the presence of the witnesses that were engaged in taking the photographs and observing the situation at the time they were taken.    The photographs were taken, however, on the 29th of August, six days after the accident.    The witness Devlin, who superintended the taking of the photographs, testified that he had climbed the pole about an hour after the accident, and that there had been no change in the situation or condition of the pole or the

wires in the interval of the six days. No evidence was produced tending to show there had been any change in the conditions during the period intervening between the death and the taking of the photographs. Apparently, the electric light pole stood only about three feet distant from the telegraph pole at the bottom, and the distance between the two was not over five feet in the region of the wires. At the time the photographs were taken, according to the testimony of Hanks, he climbed a pole, carrying with him a piece of insulated wire, one end of which had been stripped down to the metal and attached to the iron trolley pole, so as to form a metallic circuit for electricity to the ground; that he put the exposed end of the wire which he held in his hand near to the iron brace, and when the contact was made with the iron brace it produced a flash of light occasioned by a discharge of electricity from the brace into the wire and through the wire into the trolley pole and into the ground. According to the facts narrated in addition to those already mentioned, it is insisted in behalf of the plaintiff that it was established that the brace was heavily charged with electricity, occasioned by the contact of the electric wire with it. During the trial it appeared that the Western Union wires contained only about 160 volts on an average, and according to the testimony given by some of the witnesses that sometimes went as high as 250, and that the linemen were accustomed to handle the wires of the Western Union Company without gloves, and without receiving any injury or shock, even if they grasped the wires with the naked hand. It was sought by the plaintiff to establish that it was the electricity from defendant's wire which charged the brace, and that the electricity found in the brace could only be accounted for by supposing that the wire of the defendant communicated the same to it. Bearing upon that question, evidence was given to show that telegraph wires were at a very low amperage, and that the electric light wires were at a high amperage. Evidence was given tending to show that voltage relates to the strength, and that amperage is the amount of the electric fluid.

The plaintiff called as a witness McNierney, a foreman of the Western Union Telegraph Company, who had charge of the workmen in 1894, and who was acquainted with the pole where the injury was received, and he testified that he had knowledge when the electric light company's pole on the northwest corner of William street was placed there; and he added: .

"I know that I sent a man to see that they cleared. There was trouble about the electric light men setting their poles. They set them too close, and I had to send to have them clear them."

This witness says the defendant's poles were set in August, and he adds:

"I had some talk with Mr. McGuire, the general foreman, and Dillon, the superintendent and general foreman, of the electric light company about the poles on William street. This pole was not so bad as others. I didn't specially mention it. I had a talk with them about the series of poles on William street near the Central Belt Line, of which this pole was one. * * * After the new electric light poles were set. they were up close to my cross-arms, but not so close they would interfere with my wires, with the exception of one place they raised up my wire onto the cross-arm, and that is the first pole

east of this pole in question. * * * I had a talk with Mr. Dillon, the general foreman, about this wire and others. If this electric light wire was only about six inches below the bottom cross-arm, it would be about eleven inches from the Western Union wires, which were above the cross-arm. The cross-arm being four inches wide, and the pin above being six inches, the wire would be five to six inches above the top of the cross-arm; the cross-arm would be about four inches; that would make nine or ten inches, and the electric light wire was six inches below that, so it would make the electric light wire something like eleven inches from the nearest Western Union wire. If one of the Western Union wires sagged or broke, and came in contact with the electric light wires, it would burn out our safety wires, and probably our instrument. The electric light wires and our wires run along William street, parallel. The electric light wires were right under our wires, and run from pole to pole. * . * * The electric light wires are insulated. * * * If that insulating material is ripped off the electric light wire, and it comes in contact with another piece of metal, that metal becomes charged with electricity, if there is any connection with the ground, or with any metal substance going to the ground. In this case, if the electric light wire which was strung on this electric light pole to the next pole east rubbed against the iron brace on the Western Union pole, and the insulating material on the electric light wire was rubbed off, that iron brace would become charged with electricity, and if any person caught hold of that iron brace with his bare hand, and he also in any way made a circuit to the ground, either through another wire that he had in his hand, or in any other way, he would receive a heavy shock of electricity in this case. The effect of that shock would be—well, holding that brace, my experience is— it would throw him, make him lose his hold, give him a shock. If this iron brace that supported the lower cross-arm was not charged with electricity, it was a perfectly safe thing to catch hold of. Unless it got charged with electricity from some outside source away from our pole, there was no danger in catching hold of that brace. The brace was strong. That was a proper thing to catch hold of up there; it is customary to catch hold of that. It is a proper thing for a man up there, examining a wire to see if it is properly insulated, to catch hold of that brace in doing so. I have done that myself. If the brace is charged with electricity from an electric light wire, it is not a safe thing to do."

Numerous witnesses testified that a party could not discover, by looking up from the street, whether the electric light wire was in actual contact with the iron brace on the telegraph company's pole, although it could be seen that it was close to the brace. Nor could any one determine that the insulating material had been rubbed off while standing upon the ground. The witness Devlin, who examined the pole, brace, and wires an hour or two after the accident, testified:

. "I found it touched the Western Union brace on the street side under the last cross-arm,—the electric light wire on the pin next to the pole on the street side. There were three electric light wires on that pole; two on one side and one on the other. * * * I did not test the brace at that time, or touch it. I should judge that where the brace and wire came in contact would be about five or eight inches below the bottom of the Western Union cross-arm. I could not tell until I got up on the pole whether the insulating material that surrounded the electric light wire was rubbed off. When I got close, I could see that the insulation was worn off of the electric light wire. It looked like the wire itself was directly in contact with the brace. * * * I looked at the wire and brace in question from the ground. I couldn't see any change from the 23d of August to the time on the 29th when I went to take the picture. I looked to see, and there didn't look to be any to me."

This witness also testified that he saw the flash when the picture was taken, and he added, "I know what made that flash." When the question was propounded to him, "What made that flash?" it was objected to on the ground that the question called for an opinion, and

that the witness had not been shown to be competent. The objection was overruled, and the defendant took an exception. The witness then added, "The contact of that wire with the brace made the flash." The witness was then asked, "You were asked to explain what made the flash," and the objection was renewed, and an exception taken; and the witness answered: "Touching the wire to the brace made the flash. Q. What did that indicate in regard to the condition of the brace?" The witness answered: "To the best of my recollection, that flash was made three or four times." We think the question called for an observed fact, and that when the witness described the circumstances under which the contact was made by means of the wire with the brace, and that as soon as the contact took place a flash appeared, he stated a fact which we think was competent, and the exception to his evidence does not present error. In Manke v. People, 17 Hun, 417, affirmed 78 N. Y. 611, Talcott, P. J., said, "the question discussed lies very near the line which divides cases in which opinions are competent to be given in evidence from those which are clearly inadmissible." And he reached the conclusion that the opinion of the witness, formed by a process of reasoning upon the facts known to him was incompetent, as he was asked whether a piece of alleged wadding fired from a gun had the appearance of wadding fired from a gun, and was allowed to express his opinion. We think the case differs from the one in hand. The case of Ferguson v. Hubbell, 97 N. Y. 507, differs from the case here, as there it was held that it was not proper to allow a witness to answer as to when was the proper time to burn a fallow.

It is insisted in behalf of the defendant that the evidence to which we have adverted proves nothing whatever against the defendant, and it is suggested that the intestate lost his balance, and fell to the ground, or that in some other way he fell, and that the evidence does not sufficiently indicate that he received any current of electricity sufficient to cause a shock from any wires except his own wires. The plaintiff called as a witness one Hurlburt, who saw the accident, and helped pick up the deceased, and carry him into the flag shanty, and the witness stated:

"He fell off on the east side; right off backward. * * * His head went back, and his spurs held his feet. His head was towards the west as he fell back. He didn't breathe after I got there. He struck right on the sidewalk; right near the curbstone; right at the foot of the pole on the side nearest the tracks; just east of the pole on the sidewalk. He had his coil of wire on his right shoulder. * * * I remember some braces on that telegraph pole under the cross-arm. He was near the cross-arm, so that, if he had put his hand out, he could have reached the brace. I think he was within reaching distance of the brace."

The witness then added that he looked at his hands after he fell, "and on the left hand there was a little rust; it might have been an inch wide; just marked across the palm of his hand; a mark of rust." The deceased was taken to the morgue, and the next day an autopsy was held in the presence of the coroner and physicians; and one of the physicians testifies that conditions and circumstances were found which tended to indicate that the deceased received a shock of electricity. In speaking of the hand one of the physicians observed:

"It looked as if the hand had come into contact with a wire or brace, and that it had produced a slight hyperæmic condition of the skin on the joint. * * * There was something in the man's condition, as I examined it, which indicated to me that he had received a more or less severe shock of electricity."

This witness gave other facts and circumstances tending to fortify the opinion expressed by him, and he was thoroughly cross-examined, and to some extent his utterances were shaken. Upon this subject the defendant called two other physicians, who gave evidence tending to contradict the testimony offered by the plaintiff relating to the appearance and indications of the deceased, and. tending to show that he was not a victim of an electric shock. After a careful examination of the evidence supporting the theory of the plaintiff and the evidence of the defendant tending to contradict and to explain and to overcome the evidence of the plaintiff, we are of the opinion that a question of fact was presented to the jury for determination as to whether the deceased received an electric shock which caused him to fall, or which caused his death. We think the questions presented by the evidence in regard to the circumstances of his injuries required the submission of the question of fact in that regard to the jury, and that we ought not to disturb the verdict of the jury so far as it relates to that branch of the case. We think Strohm v. Railroad Co., 96 N. Y. 305, to which we are referred by the learned counsel for the appellant, differs from the case in hand. In that case a speculative opinion was held not to be admissible which related to consequences which were contingent, speculative, or merely possible as to the future. The evidence to which we have adverted in the case here related to the conditions of the body of the deceased as seen, inspected, and disclosed to the physicians making the post mortem examination, and upon the conflict found in that evidence we think a question was fairly presented for the consideration of the jury.

Whether the deceased took hold of the brace with his right hand or not may be said to have been a question of some doubt upon the evidence which was offered at the trial, as it was also a question of fact to determine whether the injuries which he received resulted from clutching the wires of his own company, having a voltage of only 160, or whether he received the greater shock from the brace which was in contact with the wire carrying a voltage of 1,100. We think the plaintiff's evidence, as well as the evidence offered by the defense, left those questions in such a condition that it was the duty of the court to submit the same to the jury, and that the trial judge committed no error in refusing to direct a verdict as requested by the defendant.

It is strenuously argued by the learned counsel for the appellant that the deceased could not possibly have fallen from the pole in question because of any shock which he received from defendant's wire, and, in fact, did not receive any such shock, but fell accidentally, and while carelessly leaning back too far to carry over the testing wire from the trolley pole to his wire, or by a shock from his own wire, or from the street-railway wires on the trolley pole. We are not able to assent to the argument of the learned counsel

in that regard, and cannot, therefore, interfere with the verdict upon any conclusions we may form in regard to such aspects in the case. We think the questions properly belonged to the jury.

It is appropriate at this point to recall the fact that the defendant was compelled to concede "that the wire of the defendant's lighting system, which was used for carrying a death-dealing current, was against the brace on the Western Union pole, and that the plaintiff's intestate was in a position where he might have touched the brace," and that the insulation had been worn off, and upon the facts being before the court upon such questions we think the court committed no error in taking the verdict of the jury in respect thereto; and the evidence presented a legitimate question for the jury to determine whether the plaintiff's intestate received a shock from the defendant's wire, which caused his death.

In Clarke v. Railroad Co., 9 App. Div. 54, 41 N. Y. Supp. 78, it was said:

"The fact that the defendant brought electricity into the street for use as a motive power, and the fact that electricity so employed was capable of escaping in such a way as to produce the casualty which actually took place, were sufficient, taken together, to justify the inference that the accident was due to the agency of the defendant, in the absence of proof that it was otherwise caused. The maxim 'Res ipsa loquitur' is directly applicable."

In Ennis v. Gray, 87 Hun, 361, 34 N. Y. Supp. 383, it was said:

"So here we might ask whether the happening of this accident does not carry with it an imputation of negligence, it being self-evident that, if the wires had been properly insulated, it would not have occurred, and it being equally clear that with the exercise of ordinary care defective insulation could be avoided. * * * The plaintiff assumed the burden of establishing the negligence of the defendant, and in that connection presented evidence from which the jury properly could infer that the position and manner of construction of the wiring and electrical converter were improper, and that in five places the wire was imperfectly insulated, and bore evidence of having been in that condition for some time." Evans v. Gas Co., 148 N. Y. 113, 42 N. E. 513.

Here we have the positive evidence that the wire of the defendant was carrying a large voltage, and the insulation had been worn off where the wire came in contact with the brace of the Western Union Telegraph Company, and we have the fact that the deceased was legitimately in the pursuit of his employment upon the pole of the Western Union, and that while upon the ground the fact was not discoverable by ordinary care and observation that the defendant's wire was in contact with the brace, and that the insulation had been rubbed off to such an extent as to enable the wire to charge the brace, and we think it was legitimately a question of fact for the jury to determine whether the deceased, upon the whole volume of evidence that was delivered, received a shock from the brace, which had become heavily charged with electricity from the wire of the defendant. We think the evidence was sufficient to warrant the jury in finding that the defendant was negligent in having so left its wire that it might come in contact, and lose its insulation, and charge the brace. And it was also a question whether the defendant had been negligent in inspecting its wire, and properly guarding against its contact with the property

of the Western Union. And we think the case falls within the principle laid down in Clarke v. Railroad Co., supra, where it was held:

"That the evidence amply warranted the inference that the horse was killed by an electric shock received from some source; and that, as defendant had brought electricity into the street for use as a motive power, and as electricity so employed was capable of escaping in such a way as to produce the casualty which actually took place,—these facts were sufficient to justify the inference that the accident was due to the agency of the defendant, in the absence of proof that it was otherwise caused."

In the case in hand it was for the jury to determine whether the accident was caused by other circumstances such as were disclosed in the large volume of evidence offered by the defendant tending to account for the accident, without its fault or negligence. After perusing that evidence, we are not able to say that the jury has gone wrong, or that the trial judge committed any error in leaving the whole question of defendant's alleged negligence to the jury. Nor do we think the learned trial judge committed any error in submitting to the jury the question as to whether the plaintiff was guilty of contributory negligence. Although it was conceded that the deceased did not wear any gloves, the evidence tended to indicate that none were in use by the employés of the Western Union Telegraph Company, nor was there necessity for their use in the ordinary business in which the deceased was engaged. Doubtless the deceased supposed that the wires of the defendant had been properly insulated, and in making use of the brace for his aid or protection when holding himself upon the pole with spurs he only pursued the ordinary course by persons of ordinary care and prudence when engaged in such employment. At least the evidence warranted the jury in so finding, and therefore we ought not to disturb their verdict in that regard. Although Aldrich, foreman of the Bell Telephone Company, testified that that company had rules requiring employés to wear gloves working on poles and around trolley and electric light wires, and that their men "are supposed to have gloves with them," it was nevertheless a question of fact for the jury to determine whether the deceased exercised ordinary care, under the circumstances disclosed by the evidence, as to his employment as a lineman in the discharge of his duties relating to the Western Union wires. Gilman v. Railroad Co. (Mass.) 47 N. E. 193.

The learned trial judge delivered a full and exhaustive charge to the jury; in the course of which he said:

"The measure of the defendant's duty with reference to the erection of this pole and of these lines was reasonable care and prudence under the circumstances which surrounded the operation. That was the measure of its duty; and if it used that degree of care and prudence which a man—an intelligent man—would ordinarily use in his private business under the same circumstances, then the duty, so far as the constructing of the poles and line is concerned, was performed."

He then proceeded to say:

"Assuming that the pole and wire were carefully and prudently erected at this point, then the duty devolved upon this defendant of afterwards maintaining

a reasonable oversight, supervision, and inspection to see that the wire and the pole were kept in a safe and suitable condition. Therefore the claim of the plaintiff is that they failed—entirely failed, according to the evidence in the case—to maintain such oversight and supervision after the pole was erected, and that in consequence of that failure on the part of the defendant that the insulation of the wire .was worn, and the wire itself came in contact with the brace, and created a condition of things which resulted in this man's death."

He then proceeded to submit carefully the question of whether the deceased was guilty of contributorv negligence to the jury, and, in response to a request that he charge the jury "that there is no evidence sufficient to warrant the jury in finding that when Dwyer received his fall there was any apparent trouble or defect in the defendant's system of wires other than the alleged defect of the wire in contact with the brace on the pole in question," he observed: "There is no direct evidence of it. I do not know there is any." The counsel for the plaintiff then said, "I admit there is no direct evidence, but I think there is inferential evidence." We think the court was not called upon to go any further in its charge, or to restate its response to the requests as made. Upon the whole case we are of the opinion that the evidence warranted the jury in finding that the defendant was guilty of negligence, and that the plaintiff was free from contributory negligence, and that the negligence of the defendant was the proximate cause of the death of the intestate, and that the learned trial judge committed no error in refusing the motion for a new trial on the minutes; and we therefore affirm the order.

Order affirmed, with costs. All concur.