## LAW v. CENTRAL DIST. PRINTING & TELEGRAPH CO.

(Circuit Court, W. D. Pennsylvania. September 8, 1905.)

### No. 47.

1. MASTER AND SERVANT—INJURY OF SERVANT—NEGLIGENCE AND CONTRIBUTORY NEGLIGENCE.

Plaintiff, who was in the employ of defendant telephone company as cable splicer, was sent by a superior in the daytime to locate and repair an injury to the cable sheathing which had been reported. He climbed a pole which stood at a place where the street curved and between two lines of electric light wire, the outer one of which had been fastened on a bracket to the telephone pole to hold it from swinging against such pole and wires. This wire had become detached from the insulator and had dropped against the pole, and was in contact with a guy wire, and plaintiff, taking hold of such guy wire, received a shock which caused him to fall, and he was injured. The displacement of the light wire could not be observed from the ground, and the placing of the pole between the light wires and the manner in which the light wire was fastened to the same were shown to have been usual and customary. *Held*, that defendant was not chargeable with negligence, either because of such mode of construction or for failing to discover the dangerous condition of the wire, which could not have been done by the usual methods of inspection. *Held*, further, that plaintiff was guilty of negligence contributing to his injury in failing to see and avoid the danger after he had climbed to the place of contact of the two wires.

2. SAME—PLACE TO WORK—MEASURE OF CARE REQUIRED.

A master is bound to the exercise of only reasonable care with respect to machinery, appliances, or places to work, and the measure of such care is that ordinarily exercised by others in the same business.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 173, 178, 179.]

At Law. ·On rule for judgment non obstante veredicto on reserved points.

W. S. Dalzell, for the rule.

J. W. Kinnear, opposed.

ARCHBALD, District Judge.[1] The jury by their verdict found the defendant company guilty of negligence, and absolved the plaintiff from blame; but the question is whether this was justified by the evidence, which is now to be determined on the points of law reserved. There is no controversy over the material facts. On the occasion of the accident the plaintiff was in the employ of the defendant as a cable splicer, having been advanced to that position by reason of his previous good record as a lineman, at which work he had been engaged for three or four years. In that capacity he was required to climb the poles of his own and other companies, moving among and about the various electric wires and appliances upon them, and making repairs to the telephone cables wherever they were found necessary. On the day in question he was ordered by the defendant company's test-man to go down along Iron street, in the city of Johnstown, Pa., where he was then stationed, and fix up a cable somewhere out in that direction which was supposed to need mending by having been mashed against

[1] Specially assigned.

an electric light pole. There was nothing more specific than this in the order, and, being familiar with the lines of poles and wires in that locality, he was supposed to himself discover the injury and fix it. Taking along his brother as helper, he proceeded in the direction indicated, making observations as he went, in order to do so. It was about 11 o'clock in the morning of a bright day in August, and, as he came to the pole where the accident occurred, he said to his brother that this seemed to be the place and he would go up and see. The trouble was not just there, but at a pole of the Johnstown Electric Light Company, about 35 feet distant, against which the cable had jammed and worn; and it was the plaintiff's purpose to climb the telephone pole and work his way from there out along the cable to where it was injured. The pole, where he was, was intermediate between the poles of the light company, which had two lines of wire extending along Iron street, one on each side of the telephone pole which stood in between them. The street curved at that point, and to keep the outer electric wire off of the telephone pole a bracket with a glass insulator had been fastened to the latter and the electric light wire attached to it. And to meet the strain caused by the bend in the telephone line, conforming to the curve of the street, a guy wire had been tied around the pole and stretched to a stub about 250 feet distant. Without observing that there was anything wrong with any of the wires, excepting the cable that he was to fix, or that there was anything unusual or out of place, although he did notice that the bracket was vacant and that the light wire was down near the guy, the plaintiff climbed the pole, and with his eyes facing the sun reached out with one hand and grasped the cable, and with the other took hold of the guy wire, at once getting a severe shock, which drew him together for a second, and then, his weight breaking his hold, he dropped to the ground, receiving the injuries from which he has since suffered. The fact was, although it had escaped his notice, that the outer electric light wire had not only got loose and fallen from its fastening on the bracket, but was in contact with the guy wire, and was also, by the bend in the line, drawn close against the pole, into which it had burned a crease some five inches long and about an inch deep. The guy wire, although ordinarily carrying no current and entirely harmless, was thus highly charged and dangerous by reason of its contact with the light wire, from which the insulation was also off; and it was in this way that the plaintiff got his shock.

That the situation presented a peril, except as care was exercised to observe and avoid it, may be conceded; but the defendant company was not an insurer, and that of itself does not make out a case. It must still be shown that the dangerous condition resulted from the neglect of some duty charged on the defendant by its relation to the plaintiff, or there can be no recovery. The case is clearly to be distinguished, by reason of this relation, from Dwyer v. Buffalo Electric Co., 20 App. Div. 124, 46 N. Y. Supp. 874, which is relied on by plaintiff's counsel, where the defendant was held liable for a shock received by a lineman in taking hold of an iron bracket supporting a cross-arm, which was in contact with one of the defendant's electric

light wires negligently strung too near it. The lineman in that case was not in the employ of the electric light company, but of a telegraph company whose pole he had climbed in the course of his work; and the duty and degree of care which was due him was thus that which was due to the general public, and it is with reference to this that the observations of the court were made. But, neither, on the other hand, am I prepared to hold, as in Chisholm v. New England Tel. Co., 176 Mass. 125, 57 N. E. 383, that the danger encountered by the plaintiff here was one of the risks assumed by him in accepting employment. In that case a lineman, while engaged in stringing a telephone cable, accidentally hit his feet against a highly charged wire of another company at a point where the insulation was worn off by rubbing against a tree, and was killed, and it was held that there could be no recovery for his death from the company with whom he was employed; it being declared that the danger from an imperfectly insulated wire was one of the most characteristic risks a lineman has to encounter. Without undertaking to dispose of the case in hand upon any such ground, and treating it as one falling within the ordinary rule that the employer is bound to exercise reasonable care to guard the places, where his employés are to work, against unnecessary danger, the question is whether or not that duty was complied with here.

In discussing this, there are some things which clearly may be eliminated. It cannot be said, for instance, that the plaintiff was sent without warning to a place of known danger. The fact is that he was given no specific instructions, except to go out in a certain direction and look for damage to the sheathing of the cable, which had been reported by one of the linemen. There was nothing to indicate, by a disturbance at the central office, that there was any crossing of wires or interference of currents, so as to suggest a danger and call for a warning against it. The injury to the cable was external and structural, and the plaintiff was expected himself to locate and fix it. That he went up the particular pole that he did, and not the one beyond, which he might have done and escaped, was thus a matter of his own choice.

Neither can it be successfully urged that the defendant company ought by inspection to have known of and removed the danger. Both the plaintiff and his brother testify that it could not be seen from the ground that the electric light wire was in contact with the guy wire; and, if that be so, it is difficult to understand how the company could be expected to discover it, except by a character of examination which it is not the custom, nor is it practicable, to make. Ordinary care is all that is called for, and that is largely measured by what has been found necessary by the experience of the business; and it is undisputed that inspectors make their observations from the ground, and are not supposed to climb the poles unless there is something particular and special calling for it. The fact is that to charge the defendant company with failure to discover and remedy the crossing of these wires is to demand of it a higher degree of circumspection than the plaintiff himself is willing to be held to. Flood v. Western Union Telegraph Co., 131 N. Y. 603, 30 N. E. 196. For, in order to escape the charge of heedlessly running into manifest danger, he is compelled to main-

tain that, even after he had climbed the pole and was actually within reaching distance of the place, he was not able to discern and avoid the peril; and yet he expects that the defendant, with no better opportunity, nor, in fact, so good, should have known all about it in advance of his going there and have made the place safe.

This also disposes of the question whether the defendant is chargeable with notice, and so with negligence, by reason of the time which must have elapsed since the electric light wire had fallen from the bracket. The evidence is that the insulation was off at the point of contact, and that the pole had been burned into to the depth of an inch and the length of five inches. It was also testified that no rain had fallen in that locality for at least six days, and that, while the pole might have been burned in the way described in a single night if it had rained, it could not have been, during the period mentioned, if it were dry; from which it is argued that the situation had existed as it stood for upwards of that time. But time, under the circumstances, does not enter into the problem. It figures only where the difficulty is such that it might have been discovered, and so should have been, by the exercise of reasonable care and diligence. Where, as here, the situation was one which ordinary observation would not disclose, as the plaintiff's own testimony establishes, the time for which it had existed is clearly immaterial.

The plaintiff's case is therefore brought to the final position that the falling of the electric light wire, by which the danger was created, was the result either of an originally negligent construction or a subsequent negligent maintenance, for either of which, as it is contended, the defendant was liable. In two respects it is claimed that the telephone line was not what it should have been at the point of the accident. In the first place it is said that the telephone pole never should have been set up between the electric light wires, but on the outside of them, by which they would both have swung clear of it, and in the next place, if this precaution was not observed, that the light wire which made the trouble should have been fastened to a cross-arm, and not a bracket. By the former arrangement, as it is contended, there would have been no possible contact with the telephone lines or equipment, which would have been entirely to one side of the light wire; and by the other, if the electric light wire became unfastened and fell, it would be caught by the end of the cross-arm and so not get down onto the guy wire, as it did. As held at the trial, it is unimportant whether the telephone or the electric light company was originally responsible for the interlocking of these lines; that is to say, whether the telephone company came along after the electric light wires were up and set up its pole between them, warding off the one by fastening it upon a bracket, or the electric light company, which was first upon the ground, in reconstructing its lines strung the wires as they were found and nailed up the bracket. By whichever this was done at the outstart, as a matter of subsequent maintenance, both were responsible for its continuance, and, if that was negligent, either may be held.

The opinion was expressed by a number of witnesses that a cross-arm was safer than a bracket, and that it was the only proper con-

140 F.—36

struction to be employed in such a situation. The prominent idea in the minds of the most of those, however, seemed to be that by this means linemen and others who were called upon to work among the wires would have more room to get about in and be less likely to come in contact with them—so far as this case is concerned, an entirely irrelevant matter. But the further reason was also given that, if the electric light wire got untied when fastened to a cross-arm, it would lodge between the pin and the end of the arm, instead of falling down upon the guy wire; and this has therefore to be considered. Some of the witnesses, indeed, admit that even so it might sway in the wind and swing off, and that it would then fall to where the guy wire was tied around the pole, the same as from the brackets; a possibility which would not seem to make the one device, in this respect, much better than the other.

But, passing this by, as well as the counter suggestion, that in falling from a cross-arm there would be a greater sag, which would make it obvious that something was out of order, all of these matters become irrelevant in the face of the real test, and that is whether the construction, which is complained of, was usual and ordinary. An employer is not called upon to exercise the highest, but only reasonable, care, nor to make use of the latest and most approved methods and appliances, but those which the custom of the business justifies. Whatever is lacking in these must be regarded as falling within the risks assumed by the workman in accepting employment. The rule, which is the same with regard to machinery as to places (Patton v. Texas & Pacific Railroad, 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361), is thus stated in 20 Am. & Eng. Encycl. Law (2d Ed.) p. 76:

"It is not the duty of the master to furnish the best machinery and appliances obtainable. His duty is discharged when he furnishes machinery and appliances which are reasonably safe and suitable for the intended use and of the character ordinarily in use."

And, again (page 70):

"Where defective construction or maintenance of place of work is charged as the cause of the injury, the defendant may show that such place was constructed and maintained according to the methods in common use by other companies."

"The unbending test of negligence in methods, machinery, and appliances," says Mitchell, J., in Titus v. Railroad, 136 Pa. 618, 20 Atl. 517, 20 Am. St. Rep. 944, "is the ordinary usage of the business. No man is held by law to a higher degree of skill than the fair average of his profession or trade, and the standard of due care is the conduct of the average prudent man. The test of negligence in employers is the same, and, however strongly they may be convinced that there is a better or less dangerous way, no jury can be permitted to say that the usual and ordinary way, commonly adopted by those in the same business, is a negligent way, for which liability shall be imposed." If this be so, it is idle to contend that the use of a bracket, instead of a cross-arm, in the present case, was negligent. No fact is more completely proved than that this has been a common construction, where as here, an electric light wire is merely to be warded off or kept clear

from an intervening pole, and that by the plaintiff's own witnesses.[2] It may not at first seem so clear with regard to the setting of the telephone pole between the electric light wires. There was very little evidence directed to that subject. It was rather by argument that it was sought to be questioned. No one certainly undertakes to say that it was not an entirely safe and proper construction. But two witnesses were directly interrogated about it, and both answered somewhat ambiguously, suggesting a cross-arm as a relief from that, as well as the other, situation, and one at least stating that this would be the ordinary course to pursue.[3] It is safe, therefore, to class this construction

[2]Says Bayley, a man with 28 years' experience in electric work, under whom as foreman all the lines in the city of Pittsburg were constructed, after stating that a cross-arm would be the best: "Q. (by Mr. Kinnear). Mr. Bayley, did I understand you to say that, if the bracket was attached to a telephone pole with other wires upon it, it would be a safe construction? A. Provided the wire was not too big for the bracket—the weight of the wire. Q. To attach the electric light line to the bracket, and an insulator on the bracket? A. Yes; provided the electric light wire is not too heavy for the bracket. Q. (by the Court). If it was fastened up there well enough, it would be all right? A. Yes; and if the wire is not too heavy. Q. It would be all right to put it on the same pole with other wires? A. It is done every day."

So Thompson, one of the plaintiff's most positive witnesses: Q. (by Mr. Balzell). Is it not a fact that you can go around the city of Pittsburg here, and see repeatedly the telegraph and telephone poles and electric light poles, and you can go into any city in this country and see done just exactly what was done up here in Johnstown, namely, the keeping away of the wire of a strange line from a pole on a curve by a mere bracket? A. That condition does exist all over the country, but there are other cities that are adopting and compelling the companies to keep the electric light wires free. * * * Q. (by the Court). Common practice would justify the use of the bracket, where it was simply intended to keep off the light wire from the * * * intervening pole? A. The common practice would, but it would not remove the danger."

Newton, also with an experience of 9 or 10 years as lineman and line foreman, declares: "It has been a custom for years to use brackets. It is the easiest and cheapest way out. It is the most dangerous, way, but it has been a custom for years to use the bracket system."

And even Doolittle, who will not admit that the use of brackets is a common practice, concedes that he has occasionally seen them.

[3]Says Doolittle: "Q. (by Mr. Kinnear). In a case where a telephone line is being constructed along a street occupied by a high-tension line carrying 2,300 volts, and the line is on a gradual curve, and the telephone pole is erected on the outside [inside] of one of the high-tension lines, so that the high-tension line presses against it, if the pole, being in the same position, had been placed on the inside [outside] of the high-tension line, and by so doing the high-tension line had swung clear from the pole on the outside [inside], what would you say was the proper construction? A. Set the pole so as to swing clear of the wires is all I know of. I would put a cross-arm on and keep it clear.

So Newton testifies: "Q. (by Mr. Kinnear). In case a telephone line was being constructed along a street occupied by a high-tension electric light wire carrying 2,300 volts, and the pole erected by the telephone company was placed on the outside [inside] of one of the high-tension lines, so that the high-tension line pressed against it, whereas, if it were put on the inside [outside] of the line, inside [outside] of that high-tension line, being erected in the same place, the high-tension line to clear the pole on the outside [inside], state what is the proper construction in a case of that kind. A. I never saw the location of the works. If it is on a curve, it has to go to the curb line, and they would have to place the pole on that particular spot. Q. The question was, if the pole were in the same place? * * * A. * * * If the wire cleared the pole, there would be nothing for the telephone company

with the other, as among those in ordinary use; and, the defendants having thus in both employed nothing but what was common and usual in the business, there was nothing in either of which it could be convicted of negligence, and the plaintiff's action falls.

An adverse conclusion must also be reached on the question of the plaintiff's contributory negligence. Ordinarily, no doubt, this is for the jury, dependent, as it is, not only upon the facts, but the inferences to be drawn from them. Coolbroth v. Pennsylvania Railroad, 209 Pa. 433, 58 Atl. 808. But here the facts are undisputed, and there is but one conclusion to be deduced; for, disguise it as we may, the plaintiff is seeking to hold the defendant liable for that which was in reality the result of his own heedless and unthinking act. Aside from the inconsistency, already adverted to, of charging the defendant with negligence in not anticipating and providing against a situation into which he himself advanced in broad daylight, it is manifest, upon the most cursory consideration, that ordinary care was lacking in the course he took. It is undoubtedly to be taken as true that the contact of the electric light wire with the guy wire was not observable from the ground; nor that the insulation was gone, being either burned off or abraded; nor was there any particular warning, according to the evidence, in the circumstance that the bracket was vacant. But, whatever allowance is to be made for these things, they disappear after the plaintiff had climbed the pole and had the situation immediately before him. Had he taken pains to look, he could not fail to have seen, what must have been within a foot of his eyes, that the electric light wire, which was plainly distinguishable by its size, was down against the pole, in contact with the guy wire, which it thereby of necessity charged with its high tension current; and yet, notwithstanding this, he reached out and took hold of the guy wire to help himself up onto the cable, with the unfortunate result which followed. He might just as well have taken hold of the electric light wire itself, under the circumstances, and he is chargeable the same as though he had; the two being plainly in contact. It does not do to say that the sun was in his eyes. This was his own doing, and he had no business to go up into this network of wires hampered in any such way. What he could have seen with the exercise of suitable care, he was bound to see, and is responsible as a matter of law, even though he did not. Neither is it any extenuation to say that a guy wire is supposed to be harmless, carrying no current. The liability of guy wires to become

to contend with. Q. Will you kindly answer, what would be the proper construction? Ought the pole to be put on the inside or the outside? A. The pole is on the inside of the wire. If the wire is swinging clear of the pole, of course, it is on the inside, and does not come in contact with the pole. Q. State whether or not it would be a proper construction in such a case to place the * * * high-tension wire on the inside [outside] of the pole, so it would press against it, instead of letting it go clear on the outside [inside] of the pole? I understand you to say that, if the wire would clear the pole, that is the proper construction. A. Certainly. * * * Q. State, Mr. Newton, what is the ordinary practice in a case of this kind, as I stated to you in the first hypothetical question. (By the Court.) In order to have the wire, which otherwise would press against the pole, clear it. A. Put on a cross-arm. Q. That is the ordinary course pursued? A. Yes, sir.

charged in just this way by contact with others is of such frequent occurrence that even the courts have taken notice of it, and must therefore be assumed to be known to a person of the plaintiff's practical experience. Says Hall, J., in Royal Electric Co. v. Heve, Rapports Judiciares de Quebec, 11 Banc. Roi, 436:

"The fact that guy wires become from accident live wires of the most dangerous character is one unfortunately of too frequent occurrence to be overlooked or ignored in the exercise of the constant supervision which an electric system exacts, and which the public have the right to enforce."

And this is quoted with approval by Brown, J., in Alexander v. Nanticoke Light Co., 209 Pa. 571, 58 Atl. 1068, 67 L. R. A. 475.

If, then, electric light companies, in their relation to the public, are to be held to the exercise of such care that this contingency shall not happen, surely those who are led by their duties up into the midst of intersecting lines and wires are called upon to recognize the same possibility and look out for it, under the penalty of being convicted of negligence if they do not.

Sufficient weight was not given by the jury to these considerations, of their conclusions must have been different, nor, for that matter, by the court, in submitting the case to them. Upon a full review of it, however, at this time, I am constrained to hold that a verdict to the contrary cannot be sustained.

The rule to show cause is made absolute, and judgment is directed to be entered for the defendant non obstante veredicto on the points reserved.