GEER v. NEW YORK & PENNSYLVANIA TELEPHONE & TELE-
GRAPH CO.

(Supreme Court, Appellate Division, Third Department.    May 16, 1911.)

1. MASTER AND SERVANT (§ 278*)—DEATH OF SERVANT—CAUSE—NEGLIGENCE
    OF MASTER.
        Decedent, a telephone lineman, while making certain repairs, fell from
    the top of a pole and was killed. On the pole were various telephone
    wires encased in a lead cable, under which on a cross-arm were six light
    wires carrying heavy voltage. Decedent had been repairing the hangers
    on the messenger wire supporting the cable, and had sustained a slight
    shock of electricity, causing him to drop his pliers. After he returned to
    the pole, and while standing on the cross-arm, and apparently reaching
    over to unbuckle his climbing spurs, he pitched forward through the
    electric light wires to the pavement. His hands were blistered as though
    burned, but there was no direct proof that he died from an electric
    shock; his injuries received from the fall being sufficient to cause death.
    Just before he fell, he was grasping the messenger wire to support him-
    self with his feet on the cross-arm apparently not in contact with the
    electric wires, and, though after the fall a break in the insulation of one
    of the light wires was discovered six or eight inches from the cross-arm,
    there was no indication that deceased had come in contact therewith.
    Held insufficient to show actionable negligence on the part of defendant
    telephone company.
        [Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 278.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 fo date, & Rep'r Indexes

2. MASTER AND SERVANT (§ 124*)—DANGEROUS INSTRUMENTALITIES—ELECTRIC
WIRES—INSPECTION.

Where a telephone company maintained its wires on the top of a pole
carrying electric light wires on cross-arms below, it was under no obligation to inspect the light wires belonging to another when it had no reason to believe that one of its employés would probably work on the telephone wires in such proximity to the light wires that he might be injured if the insulation was defective.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 235–242; Dec. Dig. § 124.*]

Betts and Kellogg, JJ., dissenting.

Appeal from Trial Term, Chemung County.

Action by Ida B. Geer, as sole administratrix of the estate of Guy R. Geer, deceased, against the New York & Pennsylvania Telephone & Telegraph Company. From a judgment dismissing the complaint at the close of plaintiff's proof, and from an order denying plantiff's motion for a new trial, she appeals. Affirmed.

Argued before SMITH, P. J., and KELLOGG, SEWELL, HOUGHTON, and BETTS, JJ.

Mortimer L. Sullivan, for appellant.

Halsey Sayles and Stanchfield, Lovell, Falck & Sayles, for respondent.

HOUGHTON, J. The plaintiff's intestate had been in the employ of the defendant as repairer of its telephone line for about two years previous to his death, and was familiar with the details of repair and the construction of the defendant's line which ran through several counties bordering on the state of Pennsylvania. In the city of Elmira the telephone wires are encased in a lead cable which is suspended from what is known as a "messenger wire" attached to poles. In the vicinity of the junction of John and High streets in that city, this messenger wire is attached to the top of poles belonging to the electric light company, and below on a cross-arm are six wires of the electric light company carrying various voltages of electricity. The messenger wire was reached by climbing the pole through these electric light wires.

[1] On the morning of the accident, the deceased was engaged in repairing the hangers which supported the cable from the messenger wire, and in the course of his work he detached one of the electric light wires to make a larger opening for him to climb through. While at work he suspended himself by a carriage or swing from the messenger wire, pulling himself along the wire to make such repairs as were necessary. At one point his knee came in contact with an electric light wire, shocking him so that he dropped his pliers. No serious result followed, and the pliers were regained and the deceased continued his work; his helper by a rope holding the electric wire away from his person. After he had finished, he ran himself back to a pole where he had separated the electric wires, and while standing on the cross-arm which supported these wires, and when apparently reaching over to unbuckle his climbing spurs, he pitched for-

ward through the electric light wires to the pavement, striking on his head, and from the injuries thus received, or as is claimed by the plaintiff from an electric shock received while standing on the cross-arm, his death shortly occurred.

Six or eight inches from the cross-arm, on a wire carrying a voltage sufficient to kill, there was noticed immediately after the accident a break in the insulation; one witness saying that the wire looked bright and another that it looked dull. The hands of the deceased were red and blistered as though burned. There was no direct proof that the deceased died from an electric shock and his other injuries were sufficient to cause death. Just as he fell from the cross-arm, he did not have hold of the electric light wires with his hand, but was grasping the messenger wire to support himself, and his feet, on the cross-arm, apparently did not touch the electric wires or the glass pins upon which they were supported. There was no proof that the decedent had previously repaired the wires on this particular portion of the line, or that he was directed to repair it, or that the defendant had any reason to believe that the electric light wires were not properly insulated. Upon such state of facts the learned trial court nonsuited the plaintiff, and we think properly.

The situation is wholly unlike that class of cases where a lineman is set to work by a superior amongst dangerous electric light wires of which he has no knowledge without any warning that they exist. So far as the evidence discloses, the decedent received no directions from the superintendent or any officer of the defendant to repair that portion of the line where the accident occurred, and it does not appear that the defendant knew he was working or intended to work on this portion of the line. The deceased had had two years' experience in the repairing of the defendant's telephone line, and was furnished with a helper. He was entirely aware that he was working in close proximity to electric light wires which were charged with electricity, for he received a shock while some distance from the pole where he stood when he fell, which caused him to let go the pliers with which he was working. On the very cross-arm where he stood when he fell he had detached one of the electric light wires to make more room for him to let himself through between them. He did not come suddenly into a place of danger of which he had no knowledge, but could see and know the entire situation.

In Raab v. Hudson River Telephone Company, 139 App. Div. 286, 123 N. Y. Supp. 1037, upon which the appellant relies, a lineman was directed by his overseer to climb a pole to which was attached a charged electric light wire of which he had no knowledge and concerning which he was not warned. In Dwyer v. Buffalo General Electric Company, 20 App. Div. 124, 46 N. Y. Supp. 874, the lineman of a telegraph company was injured while climbing one of its own poles because the defendant, the electric light company, had negligently permitted one of its wires to come in contact with the brace of a cross-arm of the telegraph pole, of all of which the lineman had no knowledge. In Braun v. Buffalo General Electric Company, 200 N. Y. 484, 94 N. E. 206, an entirely different question was presented, for in

that case recovery was had upon the theory that the electric company negligently permitted defective wires to hang so low over private property that one working thereon was injured.

[2] The defendant telephone company was under no obligation to inspect the condition of the wires of the electric light company unless it had reason to believe that one of its employés would probably work in such proximity to them that he might be injured if the insulation was defective. The very large portion of defendant's wires throughout the city were on its own poles, and the case is barren of any proof that the defendant company knew or expected that the deceased was about to work upon that portion of the line where its wires were hung on poles of the electric light company. In addition, it is mere speculation that the deceased received any shock of electricity from the wire proven to have been defectively insulated while standing in the position in which he did and unable to touch that part of the wire where the insulation had worn or sloughed away. The defect in the insulation was six or eight inches from the cross-arm upon which he was standing, and, even if he were standing directly against the wire, the toe of his shoe would not reach to the broken insulation. With one hand he had hold of the messenger wire 18 or 20 inches above the electric light wire, and with the other he was unbuckling his climbing spurs. The very great probability is that he lost his balance, and that, if he received any electric shock, it was while he was falling through the mesh of electric wires.

No autopsy was held. The appellant claims, however, that the circumstances surrounding the fall show that the decedent must have received an electric shock, for there was no apparent reason for his falling if he did not. The decedent may have become faint or dizzy and released his hold upon the wire by which he was supporting himself. The only ruling of which the appellant complains in his brief is that he was not permitted to show what the condition of the electric wire was two weeks after the accident. From the remarks of the court it is apparent that the questions upon this subject were understood as an attempt to show subsequent repair of the wires. If the plaintiff desired to show for the purpose of description or identification that they remained for two weeks in the same condition they were at the time of the accident, he should have so indicated to the court.

Upon the evidence adduced we are of opinion the nonsuit was proper, and that the judgment and order should be affirmed, with costs.

Judgment and order affirmed, with costs.

SMITH, P. J., and SEWELL, J. (concurring). In addition to the grounds stated by Mr. Justice HOUGHTON, we are of the opinion that this nonsuit must be sustained upon another ground still more convincing. This man had been working for the telephone company for two years and nine months as a cable splicer. During this time he had worked for the company not only in Elmira, but all over the state. He worked at Ithaca, Corning, Owego, Jamestown, Salamanca, and

Wellsville, "and all over the country." The court will take judicial notice that in many places telephone wires come in close proximity to electric light wires, either upon the same poles or in crossing. Whatever knowledge, therefore, the deceased may have had as to the nature of electricity passing along the electric light wires, it was impossible for him to have been in that business for two years and nine months and not to have learned that those wires carry a dangerous current unless insulated. If they were properly insulated, or if the man himself were properly protected by rubber gloves and rubber boots, he could not suffer. It is claimed that this wiring of the electric light company should have been inspected and the defective insulation discovered. While as against a user of the telephone who was injured by any such contact such a duty may have existed, it would be absurd to send an inspector up these poles ahead of this repairer to discover for him any defective insulation. A line repairer is of necessity his own inspector as to any imperfect conditions surrounding his work arising from use or deterioration. A failure, therefore, to discover the imperfections in this insulation of this electric light wire, if such were the cause of his injury, was his own failure, for which he alone is chargeable.

KELLOGG, J., dissents.

BETTS, J. (dissenting). Plaintiff's intestate, Guy R. Geer, 34 years old, was by trade a wood turner. He went to work for the defendant about two years and nine months previously to his death, working as a helper for about six or nine months, and then became a cable splicer and worked in different places with his headquarters in Elmira, receiving $12 a week. He did cable work overhead and underground, and commenced working in Elmira on Tuesday as he was killed on Friday. He had never worked for any company that manufactured or distributed electricity, and during the 12 years that the plaintiff knew him he did not study electricity. Upon June 5, 1908, in the employ of the defendant, he went with a helper, Hungerford, 22 years old, who had only worked in that business one day and a half, and was a machinist, to the corner of High and John streets in the City of Elmira, where the deceased intended to do some work upon the telephone lines of the defendant. The work was to hook up the cable to a telephone messenger wire which was immediately above and within a few inches of the cable. Upon High street at a pole of the defendant about 23 feet from a pole belonging to the electric light company, at the northeast corner of High and John streets, the deceased began his work. This pole had two cross-arms. The lower had five electric light wires on it belonging to another company, and not to the defendant, and the upper cross-arm had four telephone wires on it. In order to get to the telephone wires and the cable, it was necessary for Geer, the deceased, to pass between some of those electric light wires. He climbed up this pole, 23 feet from the corner, worked his way through between the electric light wires, and pulled up his carriage, fastened it to the messenger wire, and began work. The car-

riage that he sat in or on "is formed of a board two feet long and eight inches wide, and is suspended by two bars, which form a crook at the top in which are placed pulleys to run on a messenger wire," which wire is above the cable. Geer worked himself along from this pole to the electric light pole at the corner, but his carriage had settled, owing to the sagging of the messenger wire, so much that he had to get out on the cross-arm at this electric light pole upon which were six electric wires, all charged with electricity, and some of them charged with between 2,000 to 3,000 volts. Geer worked himself over this cross-arm, got in his carriage again, and went on across from the north side, nearly to the south side of John street, where in some way he came in contact with an electric wire and was shocked, receiving a shock which caused him to drop his pliers. These electric wires, one of which shocked him, "passed by nearly with his knees" at the time of this shock. The pliers were returned to him, and the electric wire was pulled away from Geer's knees by the helper with a rope, whereupon Geer finished his work and returned to the cross-arm on the corner or electric light pole. This pole had on some of its arms at least two telephone wires of the defendant. Geer had loosened the second electric light wire of the six on this cross-arm, and put it to on side when he had taken his carriage over it. Upon his return to that cross-arm, he lowered his carriage to his helper, and pulled up the rope and made a loop over the messenger wire, and was about to slide down the rope between the wires which he had separated. He stooped and was unbuckling a climber and spur attachment on one of his feet when he was seen to double up and twist around and fall. He was heard to cry and to groan. He fell to the ground, was taken to the hospital, and died that night about 11 o'clock. He was found at the hospital to be suffering from a shock and a fracture at the base of the skull. It was necessary for Geer, in order to return to the ground, to work his way through these electric light wires whether he did so on the pole he was on when he fell, or whether he returned to his original pole. After the injury, it was found that the insulation was defective on one of these wires at the place that he fell; one witness stating that it was bright and another that it was dark shortly after. The insulation south of where the deceased quit working was broken; the wire showing bare places. Geer said, when starting to return to the ground, that he would slide down the cable or rope instead of returning to the original pole where he ascended, as he did not care to go through the same motions that he did in getting up into his carriage. Upon this and some other testimony of like import the plaintiff was nonsuited at the end of her case.

Upon a nonsuit plaintiff is entitled to the most favorable inferences that can be reasonably drawn from the evidence submitted. The question is, Was there sufficient evidence to justify the court in taking the verdict of a jury thereon, or was it properly decided as a question of law?

The defendant owed to the plaintiff's intestate, its employé, the duty of providing him with a reasonably safe place in which to do his work, considering the nature of the work to be done. The nature of the

work which the deceased was employed to do by the defendant was working about telephone wires which were not in themselves dangerous, so that, had there been no electric light wires at this place, plaintiff could not have complained that her intestate was placed in a dangerous position, because his work required him to climb poles and work on wires at some distance from the ground. It was a dangerous place where this deceased was placed to work if there was any defective insulation of these high voltage electric light wires. The testimony as to the condition of the wires is not very full, and it can easily be seen here why that is so, because of their distance from the ground that few people except interested people would be likely to notice them. They were, however, in this immediate vicinity, and at the place of the accident in a bad condition as to insulation directly after the accident. There is nothing to show what caused this condition. Neither was any inspection by the defendant shown, nor has the plaintiff shown the length of time during which such condition existed, if it existed before the date of the accident, unless the jury might be permitted to infer that the insulation of such dangerous wires would be of such a fairly permanent nature or character that it would take some time to wear it off or through to the wire, and that having been found bare that some time must necessarily have elapsed, and that, if the defendant had been vigilant to furnish a reasonably safe place for Geer to do his work, it would have had time to have found this dangerous condition to exist and remedied it or warned Geer.

In Dwyer v. Buffalo General Electric Company, 20 App. Div. 124, 46 N. Y. Supp. 874, a recovery was had where the deceased, a lineman of a telegraph company not wearing gloves after ascending one of the telegraph company's poles, grasped an iron brace supporting a cross-arm upon his own pole, concerning which there was evidence from which it might be inferred that it came in contact with the wire of the electric light company carrying a voltage of about 1,100 volts, from which the insulation had been abraded by contact with the iron brace, neither the fact of contact nor the defect in insulation being determinable from the ground, instantly threw up his arms, and fell backwards, and was picked up dead. Across the palm of one of the deceased's hands there was a mark about an inch wide which looked like rust, and the autopsy developed that the deceased had received a more or less severe shock of electricity. The case was sent to the jury, and upon an appeal it was held that the court was justified in submitting to the jury the questions as to the defendant's negligence and the contributory negligence of the plaintiff's intestate.

In this case the physician at the hospital who attended Geer, apparently competent, was not permitted by the trial court to testify as to whether the shock was electrical or not, or as to what his opinion was as to the character of the shock, or the cause of the shock, nor if such symptoms as the doctor had indicated would be found in a person who had suffered a severe electrical shock, or what his diagnosis showed. This evidence was not permitted on the objection of the defendant to which ruling an exception was taken by the plaintiff.

In Braun v. Buffalo General Electric Company, 200 N. Y. 485–490,

94 N. E. 206, it is held that a company maintaining dangerous wires should not be relieved on the ground of expense from the affirmative duty of exercising a reasonable degree of care to maintain proper insulation, and thereby prevent accidents reasonably to be apprehended to those lawfully coming in the neighborhood of such wires. That was a suit against the company maintaining those wires. This is an action on behalf of the dead employé who was sent by his employer to work amongst such wires; and, while the deceased was shown to be a lineman, he was not shown to be an electrician.

In Raab v. Hudson River Telephone Company, 139 App. Div. 286, 123 N. Y. Supp. 1037, it was held that, where a lineman employed by the defendant was injured while descending a pole by coming in contact with a high-voltage wire whose presence on this pole he had no knowledge of, he was not guilty of contributory negligence as a matter of law because he failed to inspect the wires, and it was held that it was immaterial that the high-voltage wire was the property of an electric lighting corporation, for the defendant in permitting it to be maintained on its poles assumed the same duty toward the plaintiff's intestate as though it maintained the wire itself, and a verdict in favor of the plaintiff was affirmed unanimously in the Second Department.

The top of the pole, which stood about 23 feet from the corner and which the plaintiff's intestate ascended, ran at quite a decided angle over towards the street. From a remark testified to have been made by the deceased, he evidently considered it more prudent to come down from the corner pole rather than to attempt to get back to the ground the same way that he went up to the wires. Hence the jury might have found he was exercising some care. Attempting to divest himself of his climbers before attempting to get through these electric wires, if he understood these wires, might also have been found by the jury to indicate care on his part. In the case of the death of a person, it has always been held that less proof of absence of contributory negligence will suffice than where the person injured is alive and able to testify. It was held in Freeman v. Glens Falls Paper Mill Company, 61 Hun, 125, 15 N. Y. Supp. 657, that where a risk relates to the safety of the place of the employment, and not to the dangerous character of the employment itself, then it is the risk of the master, and not that of the servant. I think that the case both as to the negligence of the defendant and as to the freedom from contributory negligence of the plaintiff's intestate should have been submitted to the jury under proper instruction from the court.

It follows that the judgment should be reversed and a new trial granted, with costs to the plaintiff to abide the event.